CASE 47—INDICTMENT FOR MURDER—June 22.

# Clark v. Commonwealth.

### APPEAL FROM WEBSTER CIRCUIT COURT.

DEFENDANT CONVICTED FOR MANSLAUGHTER AND HE APPEALS. RE-
VERSED.

CRIMINAL EVIDENCE—REFERENCE BY EXPERT TO MEDICAL BOOK—CROSS
EXAMINATION AS TO WHAT AUTHOR STATES—HOMICIDE—ATTEMPT
TO COMMIT ABORTION—EVIDENCE THAT DEFENDANT HELD HIMSELF
OUT AS AN ABORTIONIST—HEARSAY EVIDENCE AS TO DEFENDANT'S
SKILL AS SURGEON—INSTRUCTION DEFINING TERMS "WILLFUL"
AND "MALICE AFORETHOUGHT"—VARIANCE—INSTRUCTION AS TO
REASONABLE DOUBT.

Held: 1. Where a physician testifying for the prosecution as an
expert refers to a medical author as supporting his view, the
defendant should be permitted to cross-examine him as to what
the author states, so as to lay the foundation for reading the
authority to the jury for the purpose of discrediting the wit-
ness.

2. Under an indictment for murder, alleging that death resulted
from an attempt by defendant to commit an abortion upon de-
ceased, it was not error to permit physicians to testify that,
by reason of the fact that deceased was an unmarried woman,
the danger of exposure and the mental anguish would make
her more susceptible to shock than if she had been a married
woman, and the operation had been performed at home, in the
proper way, to relieve her of some trouble, though such wit-
nesses knew nothing of the temperament or mental condition
of deceased, and no witness testified as to her mental condition
about that time.

3. Where deceased was found dead in an operating chair in the
office of defendant, a physician, and there was testimony tend-
ing to show that she died from the shock caused by an at-
tempt to commit an abortion, declarations of defendant tending
to show that he had committed other abortions, and held him-
self out as an abortionist, were not admissible to show that
he had committed the act in question, though they might have
been admissible to show intent or motive if defendant had ad-
mitted that he had committed the act, and had attempted to
justify it upon the ground of necessity.

4. As there was evidence tending to show that the attempt to com-

mit an abortion was made in a bungling manner, it was admissible for the prosecution to prove by witnesses personally acquainted with the extent of defendant's skill as a surgeon and physician that he was unskillful, but it was error to admit evidence that such was his reputation.

5. The Commonwealth having introduced evidence tending to show that defendant was not a skilled surgeon, he should have been permitted to prove by persons in whose families he had practiced that he was capable and proficient.

6. The court did not err in refusing to permit defendant to prove by physicians that it is the universal custom for unmarried women illegitimately pregnant to take every character of drug and decoction for the purpose of producing miscarriage.

7. Instead of instructing the jury that "the willful, intentional, and deliberate doing of any act ordinarily calculated to endanger the life of or produce great bodily harm upon another from which death results, is a killing with malice aforethought, unless it be done to protect the doer or some other person from some great bodily harm then upon reasonable grounds believed to be necessary to avert such apprehended harm," the court should, if any instruction was to be given on that subject, have told the jury that: "The word 'willful,' as used in these instructions, means 'intentional; not accidental.' The phrase 'malice aforethought' means a predetermination to do the act of killing without legal excuse, and it is immaterial how suddenly or recently before the killing such determination was formed."

8. It was error to instruct the jury to find defendant not guilty if they believed deceased died from the effect of some drug or poison "not inserted into her womb by the defendant," as the indictment charged that defendant caused her death by inserting into her womb a sharp and dangerous instrument, and defendant can not be convicted upon proof that death resulted from a drug or poison administered by him.

9. Instead of giving an instruction as to reasonable doubt which was unintelligible, the court should have instructed the jury that: "If, upon the entire case, you have a reasonable doubt of defendant being proven guilty, or as to any fact necessary to establish his guilt, you should acquit him; or, if you have such doubt as to the degree of the offense, you will find him guilty of manslaughter only."

H. X. MORTON, P. B. MILLER, A. O. STANLEY AND W. E. BOURLAND, ATTORNEYS FOR APPELLANT.

The facts, briefly stated, are that, on Sundey night, September 9, 1900, between 7:30 and 8 o'clock, a couple, in a buggy,

drove up in front of Dr. Clark's residence, inquired if he lived there, and, when he appeared, the man told him he wished to see him at his office; they left, driving in the direction of his office, and he followed, carrying a lantern, and without his coat. His office was on one of the most public streets and in one of the most public places in town. It was a bright, moonlight night. Clark was seen to go into the office, leaving the door unlocked, if not open, and light the lantern. Two persons came up from a vacant lot adjoining Clark's office and went towards the office door, and in the space of five or six minutes, Clark came out of the restaurant on the opposite side of the street and spoke to Will Bradburn, who hurriedly ran off. This was, as was afterwards disclosed, after the young lady died, and Clark had come out and gone to the restaurant and tried to get Dr. Barkley by telephone; failing in this, he came out and sent Bradburn for Dr. Barkley. About this time, H. L. Skinner, seeing a light in Dr. Clark's office, went in and found Tom Holt, who told him of Miss Waller's death. Holt was thirty-two years of age, intelligent, a good business man and had been deputy sheriff. Miss Waller was twenty-eight years old. Skinner says this was a little after 8 o'clock; there was no light in the room but the lantern, no lamp in the room, and the young lady was lying in the operating chair, which was opened out like a table; she was lying straight upon it, her feet near together, clothes not disarranged, her hat and veil on, vest thrown back and hat pinned to her hair; collar and waist of her sack unloosed, and her mackintosh unbuttoned and thrown back, hanging lengthwise under her, just as one would be if taken off while lying down, not folded; no furniture in this back room but this chair; no lounge, bed or other place where one could lie down; nothing to indicate that any preparation had been made for the performance of an operation of the kind Dr. Clark is charged with.

Dr. Clark was indicted for murder by thrusting into the womb of Miss Waller some instrument, unknown to the grand jury, in the attempt to produce an abortion upon her. Upon his petition, and without objection by the Commonwealth, a change of venue was granted to Webster county, where he was tried in January, 1901, and convicted of manslaughter and sentenced to the penitentiary for ten years. He resided at Sturgis, in Union county, and the indictment was found in Union county. Dr. Clark had never seen Miss Waller before.

On the trial there was a great deal of incompetent evidence allowed to go to the jury to the prejudice of the appellant

as to conversations had with and alleged statements made by him as to other cases of this character with which he had been connected, and he was really tried for those cases rather than for the alleged killing of Miss Waller.

Believing that he has not had a fair trial, and that he is not guilty of the offense charged, we respectfully ask a reversal.

## CLASSIFICATION OF QUESTIONS DISCUSSED AND AUTHORITIES CITED.

Where an expert assumes to base his opinion upon the work of a particular author, or where he quotes an author, or authority, his work may be read in evidence to contradict him.

Conn. M. L. Ins. Co. v. Ellis' Administrator, 89 Ill., p. 516; City of Ripon v. Bittel, 30 Wisconsin. p. 619; Pinney v. Cahill, 48 Mich., p. 587; Rogers on Expert Testimony, p. 407, art. 176 (2d ed.), also 181, 182 (1st ed.); P. B. Gallagher v. Market Street Railway Co., 67 Cal., p. 13; Encyclopedia of Pleading and Practice, vol. 8, p. 769; Wheaton on Evidence, vol. 1, paragraph 166; Greenleaf on Evidence, vol. 1, paragraph 498.

All theories received should be confined to scientific deductions, and experts should not be allowed to pass upon facts, suspicions, or motives.

People v. Sessions, 58 Mich., p. 600.

If in a criminal case evidence is introduced which is incompetent, and may have been prejudicial, it is a sufficient cause for a reversal. No testimony, the admissibility of which is doubtful in such a case should ever be admitted to a jury.

People v. Sessions, 58 Mich., p. 600; Coppage v. Commonwealth, 3 Bush, p. 532; Radford v. Commonwealth, 5 Southwestern, p. 345; Kennedy v. Commonwealth, 14. Bush, p. 361; Scott v. Commonwealth, 94 Ky., p. 511.

Where the offense charged is calculated to create prejudice, and excite public opinion, especial care should be used by the court in the exclusion of incompetent evidence. People v. Commonwealth, 87 Ky., 497.

L. C. FLOURNEY, COMMONWEALTH'S ATTORNEY, LOCKETT & LOCK-ETT, AND ROBT. J. BRECKINRIDGE, ATTORNEY-GENERAL, FOR COMMONWEALTH.

The facts proven are that Cora Waller and Thomas Holt, both unmarried, went from Miss Waller's home to Sturgis, where Dr. Clark lived and kept a drug store, a distance of about twelve miles, on Sunday evening about 8 o'clock. They

Clark v. Commonwealth.

drove to the rear of the drug store and went into it. In a short time, cries of pain were heard coming from the rear of the store. They had been there some twenty minutes. Clark left in quest of another physician and Holt remained. A Mrs. Skinner, hearing that Miss Waller was dead in the office, went over there, and Holt telling her that Miss Waller was soon to have become his wife, shot himself to death with a pistol by the side of Miss Waller. Drs. Jones, Hanley and Haynes were called to make an autopsy, and found she was three or four months gone in pregnancy, her drawers pulled down beneath her hips, a blood clot in her womb, the canal to the womb wounded and at least three wounds in membranes within the womb, made with some hard instrument.

The Commonwealth introduced testimony to the effect that Clark had exhibited specimens of children prematurely born and had said he could relieve women who might get into trouble with their sweethearts, if they were not more than three months gone, &c.

To all this evidence the defendant objected, and this we understand is the ground most relied on for a reversal.

A careful examination of the evidence objected to will show, we think, that it is all admissible under well-established rules, and that it excludes all reasonable doubt of the defendant's guilt.

### AUTHORITIES CITED.

On Sufficiency of Indictment: Abrams v. Fosbee, 66 Am. Dec., 77; State v. Moore, 85 Am. Dec., 776 and note thereto; People v. Com., 87 Ky., 487.

As to the evidence admissible: Franklin v. Com., 92 Ky., 612; Thomas v. Com., 1 Rep., 122; 3 Greenleaf, secs. 15, 31; Devoto v. Com., 3 Metc., 418; Strickland v. Com., 83 Ky., 566; Am. & Eng. Ency., vol. 1, title Abortion, cases in note; People v. Kittie Sessions, 58 Mich., 594.

As to cause of death: Bishop on Cr. Law, vol. 2, secs. 635 to 641; 3 Greenleaf, 139.

Opinion of the court by JUDGE O'REAR—Reversing.

Appellant was indicted and tried for the murder of Cora Waller, alleged to have been committed on the 9th of September, 1900, in the town of Sturgis, Union county. He was convicted at the January term, 1901, of her man-

slaughter, and sentenced to ten years' servitude in the State penitentiary.

It appears that Miss .Waller was a young woman, aged about twenty-six or twenty-eight years, of a highly-respected family, herself a bright, intelligent, and attractive woman, her family standing among the first of Union county.. Thomas Holt, a young man from thirty to thirty-five years. of age, who was formerly a deputy sheriff of his county (Union), also of a well-connected family, as is shown by the evidence, and who was an unmarried man, was her lover. On the occaasion and date named he accompanied her from her home, near Morganfield, to Sturgis, a distance of some twelve miles arriving after dark. The day was Sunday. Appellant, aged about forty-nine years, was a physician of about twenty-five years' practice. He also conducted a drug store at Sturgis, where he lived. ·At about eight o'clock on the evening of the date named, a buggy,. supposed to contain Holt and Miss Waller, was driven to appellant's front gate. Appellant was in his residence,. and his .wife and daughter and some lady friends were sitting on the veranda. Holt asked if Dr. Clark lived there,. and, being informed that he did, asked for him to come out. As the doctor walked towards the gate, and about half of the distance, Holt asked if that was Dr. Clark.. Answered in the affirmative, he stated, "I want to see you in your office." Clark told him that he would meet him there as soon as he could get a light. Procuring a lantern,. he went to his office. The doctor, Holt, and Miss Waller then met at the doctor's office, which was some distance from appellant's residence, but on the same street. Within a few minutes thereafter, Miss Waller was dead. The doctor left the office to telephone to another physician, or for some purpose. One Skinner entered the office about

this time, and found the young woman to be dead, and Holt in much agitation. Skinner went across the street, and telephoned friends of the young woman of her death, and notified his wife, and returned with her to the office. Within a few minutes, Holt shot himself through the breast, and expired without speaking again. Officers and others quickly gathered at the scene of the tragedy, where the two bodies were discovered,—the woman on the operating chair in the physician's office, dead; the young man on the floor near her, dead; appellant gone to consult an attorney. The young woman was lying upon her back at full length upon the operating chair, her feet not in the stirrups, but hanging down, her dress being in no wise misplaced, her hat yet hanging by the pins to her hair, her collar and some of the buttons of the front of her dress loosed. The justice of the peace, who was present, and held the inquest, ordered a post mortem examination to be made, which was done by the aid of three physicians, who were residents of the town of Sturgis. They proceeded directly with their investigation, which developed the following: The clothing of the young woman was discovered as above stated, with the exception that her drawers were down somewhat below the buttocks. A digital examination was made by each of the physicians, discovering in the opinion of some of them some foreign substance near the lip of the vagina, which was thought to be vaseline or other oily substance. The cervix of the womb was slightly dilated, and showed a red mark upon the outer edge. Further examination conducted by the aid of the speculum showed slight abrasions of the posterior wall of the cervix. It was then determined to remove the uterus, which was attempted to be done

through the vagina by the aid of volsella forceps, a surgical instrument described as having sharp prongs to it, made something after the manner of elongated scissors, and which was used by taking hold of the neck of the womb; one of the prongs being inserted through the cervix, the other outside, and thus clutching it. The endeavor was made to draw it through the vagina, but, the ligaments and muscles holding the womb in place being too strong in resistance, and not having sufficient instruments to complete this attempt, it was abandoned. A Cesarean operation was then performed, and the uterus removed. One of the attending physicians then took hold of the uterus in his hand. With an ordinary scalpel he cut it open, and there discovered a fetus, which was determined to be of about three months' growth; a clot of blood which had settled near the lower extreminty of the womb, and near the inner os, the clot being about the size of a hen egg; one or more abrasions of the membrane of the uterus, called the decidua reflexa, which is described by the medical witnesses as a practically bloodless tissue or lining of the womb. There were one or more of these punctures, from one-eighth to one-quarter of an inch or more in length. There were no other evidences of violence or abrasions upon the body. The occurrences of that evening naturally threw the town into a state of intense excitement; so much so that when the constable and two citizens went in quest of appellant to arrest him, finding him coming from the residence of Judge Thompson, an attorney, and coming towards his home or his office, they thought it prudent to spirit him away to the county seat, some twelve miles distant, without allowing the crowd to know of his whereabouts. A change of venue was granted upon the application of ap-

pellant without objection from the Commonwealth, and the case was sent to Webster county, where it was tried.

There was no living witness to the death of the young woman save appellant. There was no mark or wound upon her person that appears to have been necessarily fatal in itself, or even dangerous. It was the theory of the Commonwealth that she died from shock, superinduced by an attempted criminal abortion perpetrated by appellant. It is of essential importance to the case of the prosecution that this theory be sustained, or the appellant must go acquitted. His presence, profession, opportunity, and other circumstances that will be noticed hereafter, are all cited as evidence of his connection with the attempted abortion; for that an abortion had been attempted by some one at some time seems to be pretty thoroughly established, and not gravely questioned. That this attempt was the proximate cause of the young woman's death depended for its proof upon the ability of the Commonwealth to sustain its theory that the wounds found upon the person of the young woman were sufficient in and of themselves to produce such a shock as would result in her death. To do this, resort was had to the testimony of the physicians who conducted the post mortem examination (no autopsy being held). Therefore the accuracy of their technical or scientific information as physicians, and the sources from which they obtained it, are of prime importance in testing the truth of the Commonwealth's theory in this case. We can not help but regard it strange that in such a case, involving the honor of a woman, and the life or liberty of a man, an autopsy was not held by these physicians. No vital organ of the woman was examined, neither her brain, heart, stomach, or other vital organ. No examination was

made of the blood vessels to ascertain whether they showed that state of congestion of blood which, as we remember, all the medical witnesses agreed would have shown wheth-er death was the result of shock. The testimony of the physicians who held this examination was to the effect that her death was caused by shock, superinduced by an attempt at abortion committed upon her person by some one using a sharp instrument by inserting it through the vagina into the womb. Upon the cross-examination of these witnesses, or some of them, the accuracy of their views, the extent of their experience, and the source of their learning—that is, the authors whom they had studied, or relied upon as the basis of their opinions, where they had not had personal experience in similar cases (and none of them had)—were attempted to be shown by elaborate cross-examination. Some of the witnesses would state the name of the author in their profession whose treatise sustained their opinion. And here is one of the principal questions presented by appellant upon this appeal. It is the theory of appellant in his defense that the decidua reflexa was atrophied at the period of this occurrence, and that the membrane which was shown to have been punctured was comparatively bloodless; that the whole of that membrane at that period did not have as much, or perhaps more, than a thimbleful of blood, and therefore not enough to have produced the clot found in the womb. It was further the theory of the defense that this clot was in every probability occasioned by the taking of some drug in the nature of ergot, which had produced enough of contraction by the womb to have rupt-ured some part of the placenta, which is described as that part of the membranous lining of the womb through which the blood of the mother is transmitted to the infant. This

part of the womb was not shown by the testimony to have been abraised or punctured. It was the evident purpose of the prosecution to show, if possible, that the blood came from the abrasion of the other membrane that was mentioned before. On this point Dr. Jones, a witness for the Commonwealth, stated that the decidua reflexa was not atrophied until after six months, and he also stated that he had read the authorities, and they so held; that he had read Hearst, and he so held. Witness was asked if Hearst did not state on page 143 that the decidua was atrophied at three months, to which question counsel for the State objected, and the objection was sustained. Witness was then asked if his authority, Hearst, which witness admitted was a standard author, did not state that the decidual membrane, at the stage at which he saw it, is not absolutely without blood vessels, to which question the Commonwealth objected, and the objection was sustained. This ruling of the court, we think, was erroneous. It is the rule in this State, as it is at common law, that books on scientific subjects are not admissible to prove the facts treated of in them. But such was not the purpose of the testimony objected to and rejected above. It will be remarked that the questions were asked the witness on cross-examination, who had testified to a certain state of fact as obtaining in the science in which he professed to be learned, and, when pressed on cross-examination to know whether such views were the result of his own experience and observation, or was the teaching of the text writers in the profession to which he belonged, he, to give credit and weight to his statement, asserted that the view so expressed by him was held by authors of respectability and high standing in his profession. In Pinney v. Cahill, 48 Mich., 584, 12 N. W., 862, which was an ac-

tion to recover of the defendant damages for the alleged
ill use and neglect of the plaintiff's horse, a veterinary
surgeon was introduced for the plaintiff, who testified that
his experience in the profession covered twenty-five years,
and, his opinion as an expert being called for, he swore
that, in his opinion, the horse died from being overfed
when too hot, which would produce colic.  On cross-exam-
ination he said that colic was caused by overdriving and
feeding when the animal is too .warm; that all works of
good authority spoke of it; and that the "Modern Horse
Doctor, by Dr. Dodd," was a work of that kind.  The de-
fendant then offered to show from this work of Dr. Dodd,
where the author treats of colic, the following:  "In nine
cases out of ten colic is the result of impaired digestive
organs.  The food runs into fermentation, and evolves car-
bonic acid gas."  This evidence was offered to discredit
this expert in connection with his cross-examination.  The
plaintiff objected to its introduction, but the court admit-
ted it.  Said the court:  "The rule is acknowledged in this
State that medical books are not admissible as a sub-
stantive medium of proof of the facts they set forth.  But
the matter in question was not adduced with any such
view.  The witness assumed to be a person versed in
veterinary science; to be familiar with the best books which
treat of it, and, among others, with the work of Dodd.  He
professed himself qualified to give an opinion to the jury
from the witness-stand on the ailment of the plaintiff's
horse, and its cause; and the drift of his opinion was to
connect the defendant with that ailment.  He borrowed
credit for the accuracy of his statement by referring his
learning to the books before mentioned, and by implying
that he echoed the standard authorities like Dodd.  Un-
der the circumstances it was not improper to resort to

the book; not to prove the facts it contained, but to dis-
prove the statement of the witness, and enable the jury to
see that the book did not contain what he had ascribed to
it. The final purpose was to disparage the opinion of the
witness, and hinder the jury from being imposed upon by
a false light. The case is a clear exception to the rule
which forbids the reading of books of inductive science as
affirmative evidence of the facts treated of." In Insur-
ance Co. v. Ellis, 89 Ill., 519, the question under considera-
tion was whether an assured had died from delirium
tremens, induced by the intemperate use of alcoholic
drinks. A witness had given the symptoms of the disease
with which the assured was affected, and pronounced it
delirium tremens. The administrator of the deceased, the
plaintiff, sought to test the knowledge possessed by the
witness of that disease by cross-examination, and in the
course of the cross-examination read to him extracts of
certain accredited medical treatises on the subject, and
asked him whether he concurred in these views, for the
purpose of testing the witness' acquaintance with the
teachings of his profession on the subject under investiga-
tion, as well as for the purpose of discrediting the wit-
ness' views when held independent of the teachings of the
profession. It was held that definitions given in the book
might be read to the witness, and he asked whether he con-
curred in those views. In City of Ripon v. Bittel, 30 Wis.,
619, the court admitted in evidence certain treatises on
surgery, and, it appearing that they were probably in-
troduced to expose or discredit the medical witnesses ex-
amined as experts, who, founding their opinions upon the
same treatises, recognized as standard authority, had testi-
fied that the books laid down such and such particular
propositions or theories, or sustained such and such par-

ticular conclusions, when in truth and in fact the books did not do so, and the witnesses were mistaken, it was held that the evidence was properly admitted. So it was held in Eggart v. State, 40 Fla., 527, 25 South., 144, that medical books may be read to the jury to contradict testimony of an expert who testified that his opinion was based on the teachings of such book, and to show that the book does not promulgate the theory advanced. Rog. Exp. Test. (1st Ed.) 181, 182; 8 Enc. Pl. & Prac. p. 769; 1 Cyc. Law & Proc. p. 186. And we think such must be the sound view; otherwise, an ignoramus in a profession might, by an assertion of learning, declare the most absurd theories to be the teachings of the science of which he was a professed expert, and, when pressed upon cross-examination as to either his own experience or the basis of his learning, would be enabled to hide behind the formidable name of some standard author, and thus foist upon the jury a most hurtful falsehood as a scientific deduction, asserted by the most eminent in the profession, solemnly declared and promulgated by him for the guidance of his brethren and the service of mankind. Therefore, in a case where such a witness makes such an attempt, it is just and reasonable that the opposite side should be permitted to test the truthfulness of his statement, and expose his ignorance or mendacity by either compelling him to admit upon an inspection of the authority that it does not sustain his views, or by reading the authority to the jury to prove that it does not, and that the witness, either through ignorance or base motive, has falsely deposed.

Certain of the medical witnesses for the prosecution were asked, over the objection of appellant, the following questions, which were answered affirmatively: "I understand you to say her mental condition—her depressed men-

tal condition, danger of exposure and the shame that would follow the exposure—would put her in such a mental condition that the pain produced by an operation would more probably be followed by a shock than otherwise." "Would any woman, in your judgment, be more susceptible to shock if this operation was performed on her away from her kindred, in a doctor's office, with no one near her to care for her,—I mean, under the fear of exposure and mental anguish,—than had she been at home, and this operation performed in the proper way to relieve her of some trouble, she being a married woman, and no exposure, of course, to fear?" It was not shown by any of these medical witnesses that they knew Miss Waller, and therefore it was not shown that they knew her temperament or her mental condition, nor was her mental condition at the time, or about the time, of the act causing her death shown by any one. It is urged for the appellant that this question presupposed the existence of the conditions mentioned without any proof of them, and that, therefore, it was improper to have submitted a hypothetical question based upon them. We do not deem that it is necessary that the mental condition of the deceased should have been shown by the positive evidence of some witness who saw her at or about the time of her death, but that it is sufficient if such circumstances are shown by the evidence as to reasonably and fairly indicate that she was in a mental condition, from all the surroundings, as indicated in the hypothetical question. We are, therefore, of the opinion that the foregoing testimony was relevant.

Another important question of practice raised by this appeal is presented in the evidence suffered to go to the jury from the witnesses Alonzo Perkins, A. R. Long, T. D. Omer, and Dennis O'Nan. The purport and effect of the

testimony of all the witnesses above named were that appellant had, on occasions before the death of Miss Waller, in some instances as many as three or four years before, conversations with them, in which it would appear that he was a professional or habitual abortionist. For example, the testimony of O'Nan was that he heard appellant, a year or more before the death of Miss Waller, say "that he had some pills—that he had a pill—that would do the work; that, if any one of them got into trouble, they would know where to come to get the pills for that purpose; that they would fix everything right;" that they were talking of pregnant women. Alonzo Perkins was permitted to state that two or three years before Miss Waller's death he had a girl in trouble, and went to defendant to consult him what to do to get her out of trouble; that defendant told him to bring the girl to him; that he would fix her up, if she was not more than three months gone; that it would not be worse than having a bad cold. However, Perkins' girl was not brought to appellant, it seems. Long was permitted to testify that in 1896 or 1897 defendant told him he had a "patent pill, a female pill," and a short time afterwards showed him some fetuses—little children—in alcohol, in bottles six or eight inches long; four or five of them. Omer was permitted to testify that defendant had said to him, before the death of Miss Waller, that he had gone to Evansville, Ind., where he had an engagement to meet a man; that he had met the man and a woman, and had performed an operation on the woman, and the man had paid him. The evidence of this last witness, however, was ruled out by the court after it had gone to the jury, upon the ground that it did not show that the operation performed was an abortion. It will be observed that none of the foregoing evidence had

any direct connection with the affair of Miss Waller. It was the evident purpose of the Commonwealth in this line of evidence of acts of appellant in reference to having committed other abortions, and having held himself out as an abortionist, to show probability that he was not only so engaged at the time of the death of Miss Waller, but that, in addition, he probably committed the act resulting in her death. Undoubtedly, such was the effect of the evidence in this case. The question presented for our decision is, is it competent, in the investigation of a charge of murder, to allow evidence against the accused that he had committed other distinct acts entirely disconnected with the one under investigation, for the purpose of showing his probable guilt with reference to the act for which he was being tried? The argument of the attorney-general is, and doubtless it was the view of the trial judge, that the facts above stated were admissible for the purpose of proving intent or motive on the part of the accused. It has been held, and such seems to be the settled law, that a physician may commit abortion upon a woman, when, in his opinion, it is necessary to do so to save her life; or another may commit the abortion under the advice of a physician that it is so necessary. And it has been held in some instances, in prosecutions for criminal abortions, that it is incumbent upon the Commonwealth to show as a part of its case that the abortion was not necessary in order to save the life of the mother. It seems that this court has not recognized the rule last mentioned. Peoples v. Commonwealth, 87 Ky., 489 (10 R., 517) (9 S. W., 509, 810). If it was shown or admitted that the defendant had committed the abortion, but attempted to justify it upon the ground of necessity, it is clear that the evidence indicated above would have been competent to prove his motive and

Clark v. Commonwealth.

intent, and to rebut or negative the idea that he was acting upon his professional judgment, and under a necessity of saving the life of the mother. In the case at bar the purpose and effect of the evidence was not so much to show intent or motive, as it was to establish primarily the guilt of the accused as to having perpetrated the act of abortion. In the opinion of the majority of the court, the admission of this evidence was error, and it should have been rejected. We are of the further opinion, however, that it would have been competent, as above suggested, as affecting intent or motive, provided there had been proof or admission that defendant had committed the act resulting in the abortion, and undertook to justify that act under the plea of necessity.

The testimony of all the medical witnesses was to the effect that the laceration of the cervix and membrane of the womb indicated that the person doing them was a bungler, or one unacquainted with that class of operation. All the witnesses seem to be of opinion that any physician ordinarily skilled in his profession could have penetrated the uterus with the sound, or instrument that may have been used, without having inflicted the wounds upon the passage to it. The effect of this testimony was, of course, to indicate that the deceased herself, or some other layman, more probably did this work than a professional person acquainted with the anatomy of woman, and skilled in the execution of the operation that was done in this case, or similar ones. It had already been offered in evidence that appellant was a physician of some years' practice. Thereupon the Commonwealth offered to prove, and was permitted by the court to prove, by Dr. Haynes, one of the physicians who conducted the post mortem, that he was acquainted with defendant's reputation as a

physician and surgeon. We may say, in passing, that all the evidence above referred to, and all that discussed in this opinion, was duly objected to by the defendant at the trial; and, upon his objections being overruled, he properly saved exceptions. It will be noted that Dr. Haynes did not state, in the first place, that he was personally acquainted with defendant's skill or proficiency as a physician and surgeon; nor did he undertake to say, from his personal knowledge of defendant's skill as a surgeon, that he was an unskillful one, or a bungler. On the contrary, he merely showed that he was acquainted with defendant's reputation,—that is, what other people generally may have thought of his skill,—and that other people thought he was not a skilled surgeon. The inevitable effect of this evidence upon the minds of the jury was that defendant was proved to be an unskillful surgeon, or a bungler, and therefore, in every probability, had he been doing the act charged, would have done it in substantially the manner shown in the testimony; that is, in a bungling manner. We are of the opinion that this was error. It was not competent for the Commonwealth to prove the extent of defendant's skill as a surgeon or physician by hearsay or reputation. We, however, decide that it was competent for the prosecution to show, if it could show, by those personally acquainted with the skill of defendant as a surgeon and physician, that they knew him to be unskillful. After the evidence of Dr. Haynes had been admitted over the objection of the defendant, the defendant then offered to prove in rebuttal of that theory that he was a skilled surgeon. He offered numerous witnesses, who offered to testify that defendant had practiced in their families in cases involving diseases of the uterus, and that in every instance he was capable and proficient, successfully per-

forming operations involving the using of sounds and other instruments in removing tumors from wombs, and in treating diseases of the womb involving technical knowledge and skill. The same witnesses offered to testify generally, also, that the reputation of the defendant was that he was a skillful and proficient surgeon. In other words, these witnesses offered to prove, both from their own knowledge, including particular instances and circumstances, and from the general reputation of the defendant in the community where he practiced and lived, that his reputation for skill was not as had been detailed by Dr. Haynes, but, on the contrary, that he was a skillful and proficient surgeon. All of this evidence was rejected by the court. The names of the witnesses who so offered to testify were: John Miller, W. T. Davis, Ben. Williams, Joseph Austin, Burd Hearin, Douglas Hearin. We are of the opinion that the court erred in rejecting the evidence of these witnesses in so far as it came from their personal knowledge and experience. When the Commonwealth introduces evidence attacking the professional ability or skill of the defendant, it necessarily follows that he should be permitted to prove affirmatively that he was a skilled surgeon, and this he may do, if he can, by those acquainted with his skill; and certainly those who have been his patients, and have had the very best opportunity of judging of that skill, should be permitted to testify. What his reputation was we have just held can not be proved either for or against him, because it is not a question of his reputation, but a question as to what was the fact as to his being skillful.

Defendant offered Drs. Quin and Dixon, who were shown to be physicians of extensive practice and experience, and in the course of their examination asked them

the following question: "Do single women take drugs and decoctions, when pregnant, for the purpose of producing abortions?" This question, on the objection of the Commonwealth, was rejected by the court. Thereupon it was avowed that these witnesses would each have stated that it was the universal custom for single women, illegitimately pregnant, to take every character of drug and decoction, with a view of relieving their condition by miscarriage. They were then asked this question: "I will ask you if the authorities do not state, and is it not a fact known to medical authors and historians of female troubles, that women in that condition take drugs to produce miscarriage?" This question was also rejected by the court upon the objections by the Commonwealth, and it was avowed that the witnesses would each have stated that all recognized authorities on the subject stated that it was one of the most marked features of this character of trouble that women illegitimately pregnant would take every character of drug and decoction. The court is of opinion that the evidence above indicated was not relevant in the manner in which it was sought to be adduced. The trial court therefore did not err in rejecting it.

At the termination of the evidence the court gave the jury the following instructions: "First. If you believe from the evidence, beyond a reasonable doubt, that prior to the finding of the indictment herein, in the county of Union, State of Kentucky, the defendant, Clark, did willfully, feloniously, and with malice aforethought kill and murder Cora Waller by thrusting into her body an instrument, which by said use was ordinarily dangerous to her life, with the intent to procure an abortion upon her, you should find him guilty as charged in the indictment, and in your discretion fix his punishment at death, or confinement in the penitentiary of the State during his natural

life. Second. If, however, the instrument, as used by defendant, if he used any instrument on her, was not necessarily dangerous to life, yet if you believe from the evidence, beyond a reasonable doubt, that it was, by the defendant, thrust into the body of Cora Waller with the intent to procure an abortion, and she was thereby killed, contrary to the wish and expectation of defendant, he should be acquitted of murder, but you should find him guilty of voluntary manslaughter, and fix his punishment at confinement in the penitentiary from two to twenty-one years, in your discretion. Third. Though the wound inflicted on Cora Waller by the defendant, if he inflicted any, may not have been sufficient of itself to produce death, yet if you believe beyond a reasonable doubt, from the evidence that such wound, owing to her condition, produced her death, when, but for the wound, she would not then have died, the wound is, in law, the cause of her death, and you should so find. Fourth. The willful, intentional, and deliberate doing of any act ordinarily calculated to endanger the life of, or produce great bodily harm upon, another, from which death results, is a killing with malice aforethought, unless it be done to protect the doer or some other persons from some great bodily harm then upon reasonable grounds believed to be necessary to avert such apprehended harm. The killing of another in an act not in itself dangerous to life, but which results in death, contrary to the will and design of the doer, when committed in procuring or attempting to procure an abortion, is voluntary manslaughter. Fifth. If you believe from the evidence that Cora Waller, deceased, died from the effects of some drug or poison, not inserted into her womb by the defendant, you will find the defendant not guilty. Sixth. The law presumes the defendant innocent of any

offense, and he can not, therefore, be convicted, on mere preponderance of evidence, of his having been proved guilty of any offense; or if, from the evidence of any fact necessary to make out his guilt, you will acquit him; or, if you have such doubt only as to the degree of the offense, you will find him guilty of manslaughter"—which were objected to by appellant.

The first second, and third of the above instructions, in our opinion, are without just criticism. It will be observed that in the fourth instruction the court undertakes to define the abstract principle of what would constitute a killing with malice aforethought and what would amount to voluntary manslaughter. If any instruction at all is to be given on this subject, there should be substituted for the fourth instruction the following: "The word 'willful,' as used in this instruction, means 'intentional; not 'accidental.' The phrase 'malice aforethought' means a predetermination to do the act of killing without legal excuse, and it is immaterial how suddenly or recently before the killing such determination was formed. The killing of another in an act not in itself dangerous to life, but which results in death, contrary to the will and design of the doer, when committed in procuring or attempting to procure an abortion, is voluntary manslaughter."

The fifth instruction is erroneous. It submits to the jury the question whether Cora Waller died from the effects of some drug or poison (one of the theories of the defense), and the court tells the jury that, if they believe that she so died, they will find the defendant not guilty. But the court qualifies this instruction by adding, "not inserted in her womb by the defendant." The correct rendering of this instruction would be that, if the deceased came to her death by reason of some drug or poison in-

serted into her womb by the defendant, then the jury may, upon that theory, find the defendant guilty; or it would admit of the construction that, if the defendant inserted into the womb of the deceased a poison or drug, and if she died from the effect of the said poison or drug administered by any other person or agency, independent of the defendant, into her stomach or other organ, and that she died from the effect of such poison last so administered, the jury are excluded from considering that fact. It will be observed that the indictment charges that the defend-- ant killed or caused the death of deceased by inserting into her womb a sharp and dangerous instrument, whereby she was wounded and lacerated, and therefrom died. It is not competent for the Commonwealth to prove, nor for the fact to be considered by the jury, that the death of deceased was caused by poison administered by defendant in any way or manner. He is not charged with that. With the clause, "not inserted into her womb by the defendant," omitted from the fifth instruction, it is without objection.

The copy of the sixth instruction, quoted above, may be the result of an error in transcribing by the clerk, but, as the copy before us is the only authentic guide we have, it is not sufficiently intelligible to submit to the jury the law of presumption as to defendant's innocence. Instead of the sixth instruction as given, the court should have given the following: "If, upon the entire case, you have a reasonable doubt of defendant being proven guilty, or as to any fact necessary to establish his guilt, you should acquit him; or, if you have such doubt as to the degree of the offense, you will find him guilty of manslaughter only."

The judgment is therefore reversed, and cause remanded, with directions to award appellant a new trial under proceedings consistent herewith. Whole court sitting.