# S. R. CARMACK v. STATE.

No. A-6716.   Opinion Filed August 17, 1929.
Rehearing Denied August 31, 1929.
(279 Pac. 964.)

M. D. Hartsell, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

CHAPPELL, J.   The plaintiff in error, hereinafter called defendant, was convicted in the district court of Muskogee county on a charge of an assault with a danger-

ous weapon, and his punishment fixed at a term of two years in the state penitentiary.

The theory of the state, as shown by the statement of the county attorney, appears on page 18 of the case-made, and is as follows:

"It is the theory of the state that the defendant, S. R. Carmack and Paul Davis were acting jointly and together in the various transactions which happened at the Maple rooms, the Antlers rooms and the Tulsa Hotel on the night of the 19th and 20th of July, and that the various things that happened in those three places that night were a virtually continuing transaction, constituting a series of offenses committed by the defendant and Paul Davis pursuant to their joint enterprise and committed pursuant to a joint design and plan between the defendant and Paul Davis."

The evidence of the state tends to show: That the defendant, who was a policeman in the city of Muskogee, and who had a commission as a special deputy sheriff, and one Davis, who was a deputy sheriff, were intoxicated. That, on the evening that the crime in the case at bar was alleged to have been committed, these two officers were out in the country from Muskogee and returned in a drunken condition. The car of Davis' was found near the scene of the crime with some empty home-brew bottles and a quart of whisky in the car, and some one had vomited on the running boards on each side of the car. That the defendant and Davis agreed together to clean up the underworld and drive the dope-heads, prostitutes, and undesirable characters out of the city of Muskogee. That in carrying out this conspiracy, they had no search warrant or warrant for the arrest of any person nor any directions from their superior officers to do any of the things they did. They went first to the Maple rooms, where they kicked open the door of the rooms occupied

by the proprietor, his wife, and his father. After taking their parties out in the porch, Davis struck John Smith and knocked him down and then knocked Smith's father down with a six-shooter, and the defendant also struck Smith with a six-shooter several times, and, when Smith requested him not to, he said, "I'll break your damn neck." Davis shot a man named Shelby and beat him with a six-shooter, and when one Hadley, a merchant police, came up, Davis hit Hadley. That these people were all sent to the police station except Hadley, but no charges were ever filed against any of them for any crimes connected with the raid. That, immediately after the happenings at the Maple rooms, this defendant and Davis went to the Antler and the Tulsa Hotels, which were connected together by a court. That the defendant and Davis came whooping and shooting up the stairs into this building, and there the defendant committed the crime alleged in the information by striking one McDaniel over the head with his six-shooter three times. That, while making this raid, Davis shot the negro porter of the Tulsa Hotel and shot a woman. That Davis came back through the court from the Tulsa Hotel into the Antlers and got the pistol of the defendant because Davis was out of cartridges, and that Davis went back and continued to shoot his pistol and terrify the guests of the Tulsa Hotel, and that every time he would shoot the defendant would holler, "Pour it on 'em Paul, kill the sons of bitches."

Finally some one called for other officers, and they came and took the defendant into custody and took his gun away from him and undertook to take Davis to the police station, and in the fight which followed participated in by Davis and the defendant, Davis was killed by the officers and the defendant disarmed and taken to the police station. Some of the state's witnesses testified

that the defendant and Davis were intoxicated, and one witness testified that they were "crazy drunk." Defendant denied he assaulted McDaniels. The theory of the defendant was that he and Davis, as public officers, were engaged in the righteous duty of enforcing the law. The defendant admitted they had no search warrant or warrant, but contended that the parties they were arresting were dope addicts, dope peddlers, prostitutes, and underworld characters, and that the premises they raided were premises of bad repute, where characters of the underworld congregated, and they were merely engaged in an honest effort to suppress vice and drive out crime. The jury settled the issues of fact in favor of the state.

The charging part of the information in the case at bar alleges:

"* * * That the said S. R. Carmack, in the county and state aforesaid, on the 20th day of July, 1926, did knowingly, willfully, unlawfully, wrongfully, intentionally and feloniously, without justification or excusable cause make an assault in and upon one S. H. McDaniel with a certain pistol, said pistol being then and there a dangerous instrument and weapon and then and there had and held in the hands of him, the said S. R. Carmack, and that the said S. R. Carmack, did, then and there with said pistol so had and held as aforesaid, strike, beat, cut and wound and injure then and there the said S. H. McDaniel with the unlawful, wrongful and felonious intent then and there on the part of him, the said S. R. Carmack contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State."

The defendant complains, first, that the court erred in permitting the introduction of evidence of the things done by the defendant and Davis at the Maple rooms and in the Tulsa Hotel, contending that none of the evi-

dence offered by the state was admissible by the state except the evidence showing the assault, if any, committed by the defendant as shown by the information in the case at bar.

In the case of Tempy v. State, 9 Okla. Cr. 446, 132 Pac. 383, 384, paragraph 2 of the syllabus, this court said:

"Evidence is admissible that tends directly to prove the defendant guilty of the offense charged, although it may also tend to prove another offense, where the two offenses are so linked together in point of time or circumstances that one cannot be fully shown without proving the other."

In the case of Beam v. State, 18 Okla. Cr. 529, 196 Pac. 720, 721, syllabus 5, this court said:

"Where a homicide is committed by two persons acting together, one by stabbing deceased with a knife, and the other by shooting with a pistol, evidence that the codefendant not on trial wounded a third person by one of the pistol shots is properly admitted as part of the res gestae, although it tends directly to prove the commission of an offense other than that charged, when the two offenses are so linked together in point of time or circumstances that proof of one cannot be fully made without developing the fact of the other."

In the body of the opinion, on page 537 of 18 Okla. Cr. (196 Pac. 723), the court said:

"While there is no direct showing of a conspiracy entered into on the part of Fisher and Beam to kill Deer, and that the homicide was the result thereof, there is evidence of concert of action on their part. According to the state's evidence, after Fisher, in the presence of Beam and with his knowledge, had assaulted Deer two or three times by striking him with a pistol, and when Deer and Fisher were struggling on the bed, Deer attempting to

take the pistol from Fisher, Beam rushed in and stabbed Deer in the right side with a knife, after which Fisher and Beam got together, and Fisher then shot Deer with the pistol."

In the case of Sledge v. State, 40 Okla. Cr. 421, 269 Pac. 385, this court said:

"In a criminal prosecution, evidence which is relevant to the issue is not rendered inadmissible by reason of the fact that it tends to prove the defendant guilty of a crime other than the one charged in the information. * * * Evidence of a different offense from the one charged is admissible, when both offenses are so closely linked or connected as to form a part of the res gestae. * * * Where there is testimony of a conspiracy to commit a crime, and of its subsequent commission, the State may, in support and corroboration thereof, show any act, declaration, or conduct of the alleged conspirators intermediate of the conspiracy and the crime which apparently recognizes the existence of the conspiracy or reasonably indicates preparation or motive to commit the crime."

See, also, Vickers v. United States, 1 Okla. Cr. 452, 98 Pac. 467; Hunter v. State, 3 Okla. Cr. 533, 107 Pac. 444; Miller v. State, 9 Okla. Cr. 255, 131 Pac. 717, L. R. A. 1915A, 1088; Littrell v. State, 21 Okla. Cr. 467, 208 Pac. 1048.

The evidence offered by the state was clearly admissible upon either of two grounds: First, that it was part of the res gestae; second, because the evidence tended to show a conspiracy or concerted action between defendant and Davis, to do the series of things and commit the series of crimes as appears to have been committed, from the evidence in the record. The evidence clearly shows that this crime was but a part of the crime which began by the unlawful entry into the Maple rooming house

until the arrest of this defendant. The case at bar is one of that class of cases in which men, acting together, start out on an unlawful mission and commit various crimes in carrying out their plans. The defendant and Davis, acting together, started on an unlawful mission when they started to search the Maple rooms without a search warrant and without a warrant for the arrest of any person in said rooms and continued to raid and to shoot and beat those that they came in contact with, both men and women, until they had raided three rooming houses and had shot and beat some seven or eight persons. The evidence complained of by the defendant was clearly admissible under numerous rulings of this court.

The defendant next complains that the court erred in refusing to permit the defendant to show by the witness John Smith that he had been caught by Davis making a delivery of morphine to another witness in the case. This court has frequently held that a witness cannot be impeached upon a collateral matter and about which the state had made no inquiry of the witness. See Payne v. State, 10 Okla. Cr. 314, 136 Pac. 201; Wharton on Evidence, par. 559.

The defendant next complains that the court erred in permitting the county attorney on cross-examination of character witnesses, to ask whether or not they knew the defendant had been suspended from the police force for drunkenness and whether or not this had been taken into consideration by them in determining his general reputation as a peaceable and law-abiding citizen and as a good officer.

In the case of Stouse v. State, 6 Okla. Cr. 415, 119 Pac. 271, 275, paragraph 3 of the syllabus, this court said:

"As the general reputation of any person is established by the opinions of witnesses as to the general estimation of his character, it is permissible upon cross-examination of such witness to show the sources of his information and particular facts may be called to his attention, and he may be asked if he ever heard of them. This is permissible, not for the purpose of establishing the truth of such facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given to his testimony."

See, also, Carroll v. State, 24 Okla. Cr. 26, 215 Pac. 797.

Finally the defendant complains that the court erred in overruling his motion for new trial because of an alleged separation of the jury after the cause had been submitted to them. The defendant claimed that the bailiff took the jury to a restaurant for supper, and while there the jury was permitted to separate and one juror to talk over the telephone. The state put on the stand John S. Barger, bailiff of the court in charge of the jury, who testified as follows:

"Q. I will ask you to state whether or not the jury was allowed to separate at any time while in your custody? A. They were not.

"Q. I will ask you to state whether Mr. Selby, the foreman of the jury was allowed to separate from the other jurors? A. He was not.

"Q. Did Mr. Selby hold a conversation over the telephone at the Baltimore Cafe where you were—Where you and the jury ate supper? A. He did.

"Q. Were you present when that conversation was held? A. I was.

"Q. Were the other jurors present? A. They were.

"Q. Could you tell the nature of that conversation over the phone? A. He was making an engagement to meet an oil man in Coffeyville on Tuesday night following the evening of that week.

"Q. Was that a long distance call? A. It was.

"Q. Did the conversation have any relation at all to this case? A. It wasn't mentioned.

"Q. Was that the only time that Mr. Selby talked over the telephone? A. It was.

"Q. And he was not separated from the jury at any time after the case was submitted to them? A. No, sir."

The defendant and his wife with other witnesses testified to a state of facts different from the bailiff and yet insufficient to justify the granting of a new trial on the ground of separation of the jury, even though the trial court should have believed the evidence of the defendant's witnesses. This court has sustained the verdict of the jury upon the ground complained of by the defendant when the acts complained of were more serious than the case at bar.

In the case of Elkins v. State, 29 Okla. Cr. 175, 233 Pac. 491, this court said:

"In a capital case, where the necessity of accommodating the jury requires that there be a division of the jury in its sleeping quarters, where each such division is in charge of an officer, this is not such a separation as will vitiate the verdict."

In the case of Forester v. State, 36 Okla. Cr. 111, 252 Pac. 861, this court said:

"In a capital case, where the necessity of accommodating the jury requires a division in the use of sleeping quarters, such separation is not the separation contemplated by the statute. Section 2716, C. O. S. 1921. * * *

Where in a capital case, after final submission, the jury was taken to the jury room, then six or seven jurors were taken from the jury room in charge of the bailiff to the lavatory, and the remaining jurors were locked in the jury room, during which time each juror testified that he did not see or talk with any one, held, not such a separation of the jury as to constitute prejudicial error."

In paragraph 4, this court said:

"As a general rule, the finding of the trial court upon an issue of fact, arising upon the evidence, offered on a motion for new trial, will not be disturbed, where the evidence reasonably tends to support such finding."

The trial court having heard the evidence on the motion for new trial upon the issue of fact upon the separation of the jury and having overruled the motion, the ruling of the trial court will not be disturbed, where the evidence reasonably tends to support such finding. The record discloses that there was no such separation of the jury as would require a reversal of the case.

The defendant complains of numerous other errors in his brief, but they are all without merit. The record in this case discloses a series of wanton acts committed by drunken public officers in the pretended discharge of their duty. The defendant and Davis were first violators of the law themselves by becoming intoxicated and by transporting whisky; they were next violators of the law by reason of the fact that they had no search warrant or warrant for the arrest of any person charged with crime and in their pretended discharge of their duty as public officers they violated the law by wantonly beating, kicking, striking with their pistols and shooting some seven or eight people in the series of raids they were pretending to make. It is no defense to say that the persons beaten and wounded were dope peddlers, dope addicts,

or prostitutes or criminals. They were human beings. They were presumably American citizens entitled to be protected in all their constitutional rights and to be arrested only in an orderly manner and with proper process and to be proceeded against in courts of justice in an orderly and legal manner. There can be no respect for law nor obedience to the same so long as men of the character of defendant and Davis are elected or appointed to official position and conduct themselves as defendant and Davis conducted themselves in these so-called raids. The acts of the defendant and Davis constituted a public outrage as well as a private injury. Davis finally lost his life resisting the officers who were trying to restrain him from any further outrages. The defendant has been brought to the bar of justice, and, by a verdict of the jury, has been declared to be guilty for the crime charged in the information.

We are of the opinion that the defendant had a fair trial and should be punished for the crime committed. Two years in the penitentiary is not sufficient punishment for an outrage like the one committed in the case at bar, but the jury were merciful, and the defendant benefits thereby.

For the reasons stated, the cause is affirmed.

EDWARDS, P. J., concurs.

DAVENPORT, J., absent.