A. P. BOUYER v. STATE.

No. A-8812. March 29, 1935.
(43 Pac. [2d] 153.)

W. P. Morrison and John Morrison, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson and J. H. Lawson, Asst. Attys. Gen., for the State.

DOYLE, J. This appeal is from a judgment of conviction of the defendant in the common pleas court of Oklahoma county, for the offense of "leaving the scene of an accident without giving information."

The information charges that on the 5th day of April, 1934, in Oklahoma county, A. P. Bouyer did then and there commit the said offense, specifying: "The said defendant did then and there unlawfully, wilfully and wrongfully while driving and operating a certain 1929 Model Ford coupe automobile, Oklahoma license No. 302A555—1934, on Highway 66 at 60th and Western, near the Oklahoma

Railway underpass, adjacent to Oklahoma City said county and state, and going north on said highway, did strike one A. H. Gray, with the aforesaid automobile and seriously injuring the said A. H. Gray, and then and there failed to stop and give the said A. H. Gray the number of such automobile, the name of the owner and the names of the passengers and the address of each one."

The jury rendered a verdict finding the defendant guilty as charged, but could not agree upon the punishment, thus leaving the same to be fixed by the court.

Motion for new trial was duly filed, and was by the court overruled; thereupon the defendant was sentenced to imprisonment in the county jail for one year, and to pay a fine of $500, and in default of the payment of the fine he be imprisoned in said county jail for a period not exceeding one day for every dollar of said fine and the costs.

The evidence upon which the defendant was convicted is conceded to establish the following facts:

A. H. Gray, on April 5, 1934, at about the hour of 8:30 p. m., was walking along North Western avenue on his way home, at Britton. When he reached a point near the underpass under the Oklahoma Railway, he was struck from the rear by a Ford car. Being rendered unconscious by this blow, he was unable to identify either the car or the driver. The driver, without stopping his car, drove on at a rapid pace, and less than a mile north, turned into Nichols Hills.

B. W. Haynes testified in substance that on the date alleged, about half past 8 o'clock p. m., he was driving towards the underpass going south; that, when about 150 feet north of the underpass, he saw a Ford coupe driven

up the road towards him, with only one light, and that, just before coming to the underpass, the Ford car swerved to the left and, passing it, came over so far towards him that it crowded him off the pavement; that this Ford car was driven by a negro. He further testified that, when he passed under the underpass, he saw an object of some kind lying at the side of the road, and he stopped and went back to where he had seen the object, and discovered that it was a man lying on the east side of the road; that he then went back north to a confectionery near the entrance to Nichols Hills, and inquired of some boys if they had seen a car go by there with one light, and they told him they had.

Earl Veatch testified that on April 5, 1934, about 8:30 in the evening, he was at Sixty-Third and Western, at the City View Confectionery, which is just a little southeast of the entrance to Nichols Hills; that while he was there a colored boy came by in a Ford coupe which had only one headlight burning, and the car turned into Nichols Hills; that he went down to the scene of the accident, and a man that had been hit was lying about a foot from the pavement.

Paul Conray testified that on the 5th of April, in the evening, about 8:30 or 9 o'clock:

"A bunch of us boys were standing around 63d street, and a blue 1929 Ford coupe came by there pretty fast. A few minutes after the car passed a man drove up and asked if we had seen a car go by with one light, and we said we had. He said there was a man hit down there by the underpass about a half mile south. We went down there and a few minutes later the police came up and asked for, and we gave them our names."

C. S. Emerick testified that he was driving north on North Western avenue and there was a dark blue car with

a tan top ahead of him three or four blocks; that just before reaching the underpass this car swerved across the road, and at that time there was another car coming south; that his car was doing 40 or 45 miles, and the car ahead was going much faster; that he noticed a man lying by the roadside; that he went by about 50 feet before he could stop, then came back and took the man out of the mud; that later he went over to the garage and picked the car out of all the cars there by himself.

W. H. Ridge, county evidence man, testified that he had occasion to go to the scene of an accident near where the Oklahoma Railway underpass is on North Western avenue, and, when asked when he went out there, what he found, answered:

"We found the ambulance just leaving, taking the party that had been hit on the head, to the hospital, and we learned from witnesses there, that a man had been struck by a car that didn't stop; it kept on going. We learned it was a Ford coupe, about a '29 model, blue-black in color, with a khaki top on it, and it was driven by a colored man, with one light burning, one light out. We also learned that a colored boy driving that type of car at that time, had turned into Nichols Hills, that he was a colored man that worked for Blackstock. We immediately went to the Blackstock residence and we saw the Ford coupe sitting out off from the house by the side of the road. We examined it. The motor was warm; in fact, I would say it was hot. The right headlight was out."

He was then asked:

"Q. Did you examine the front of the car for any breaks or bends? A. There was a little, but it was pretty hard to describe. The place on the bumper where the little clip fastened the bumper, it had slid over a little, and also a bend in the fender—the right fender, and a kind of curve; not what you would call a square curve like it had

been hit or bent, but a round, soft curve in the fender. It appeared to be fresh, and also a little break in the side of the fender. I guess you would call it the rubbed part, or under part of the fender. There was a little break on it, the paint had cracked on it, and it was a fresh break.

"Q. Now, did you have any conversation with this defendant about that? A. We did.

"Q. All right, tell the court and jury what that was? A. The defendant told us he had been there about an hour and a half, and he denied having any knowledge of the accident, and we learned also that he had come in about 8:30. We also found in the car, two empty whisky bottles, and one of them had about that much whisky in it."

Y. V. Burke testified that he was deputy sheriff of Oklahoma county, and was called out to this place where the man had been injured. When he arrived, they had just picked him up and put him on the ambulance carrier. He inquired of Bill Ridge, county evidence man, about what happened, and any information he knew about it; that they found two boys and a Mr. Haynes, who told them what they knew about it, giving answer to the question:

"Q. Then, what did you do, Mr. Burke? A. We learned that A. P. Bouyer, who works for H. L. Blackstock, about two or three weeks previous, had bought a car similar to the description of the car that hit Mr. Gray there at the underpass. We went to Mr. Blackstock's home and found this coupe—'29 model, blue-black, on the west side of Blackstock's home, out in the street. We looked it over and discovered that it had one headlight, the right fender was bent a little, just a kind of dished-out bend. We also noticed on the bumper the clamp had been skidded just a little. In the car we found two whisky bottles.

"Q. Did you have any conversation then, with the defendant about this? A. I did. We walked up in the

yard to the servant's quarters; there was a light when we drove up, but some one turned the light out. I went back and knocked. I had known A. P. Bouyer for sometime, and I hollowed, 'A. P. are you there?' and he didn't answer for a few minutes, and then he said, 'Yes, I am here.' He said 'Who is it?' and I told him it was 'Salty'—that is my nickname, and he finally came to the door with two other colored boys, and of course I asked him about it, and he said, well he didn't know that he had hit anybody, and that he had been down town. We asked him about what time, and he said, 'Well, right around dark.' And I asked him where he had been, and he said he had been over on the East side; and we asked him what he had done, and his actions, and he said he and one of the two colored boys that was there with him at the time, had obtained some whisky, and the two of them had drunk it. At that time he had an odor of intoxicating liquor on his breath; and so I brought him down. And he said, 'Let me change my clothes' and I said, 'All right, A. P., go ahead and change them'."

At the close of the state's evidence, the defendant asked for a directed verdict of not guilty in the form of a general demurrer to the evidence, which was overruled. Exception reserved.

On the part of the defendant, David Morrison testifieed that he lived in the neighborhood of Sixty-Third and Western; that Mr. Blackstock's place, where the defendant, A. P. Bouyer, works, is directly behind his place; that he drove up when the officers were questioning the boys around there, and heard the boys say the car had green shades on the headlights, and that one light was out; that, after the defendant was arrested, he went back to Sixty-Third and Western, and a car going south, with green shades, came by that filled the description the boys had given to the officers, and these same boys said at that

time that that car going south filled the description of the car that had struck Gray.

Earl Veatch and Paul Conray were called in for identification, and the witness testified that they were somewhat of the description of the boys he saw there. Upon cross-examination he was asked the question:

"Q. I will ask you if it is not a further fact that this negro boy was drunk when you were over there? A. No, sir, he wasn't very drunk; he had been drinking, but he could walk and was in his right mind."

Mitchell Andrews testified that he lived at the filling station at Sixty-Third and North Western, and was working there on the night of April 5th, and that he knew Earl Veatch and Paul Conray; that he heard the witnesses, Veatch and Conray, giving a description of the car they had seen turn into Nichols Hills, to the officers; that they said the Ford coupe that turned into Nichols Hills had green half shades over the front headlights; that, after defendant was arrested, the boys continued to stay around Sixty-Third and Western, and David Morrison was there when a Ford coupe going south on Western, with green half shades over the front headlights went by, and Veatch and Conray said, "There goes the car"; that he serviced the defendant's car and had noticed the dent on the right front fender about ten days before the accident; that the defendant's car did not have green shades on the headlights.

At the request of the defendant, the state not objecting, the jury was allowed to view the defendant's automobile.

A. P. Bouyer, the defendant, testified: That he and his wife were both employed by H. L. Blackstock and

lived in the servants' quarters on the Blackstock premises; that on the night of his arrest he had been home about 45 minutes or an hour; that he had been down in the city and returned over North Western; that he did not hit any one on the road home in his automobile; that the dent in the right fender of his car was up on top of the fender, at a point where it is impossible the right front fender could have hit a man and not broken or dented the headlight; that his car was in the same condition when the jury viewed it as it was when he was arrested.

On cross-examination he stated:

"I am sure I was home 45 minutes before I was arrested. I drove home from Second street; I wasn't drunk that day; I drunk just about that much out of a half-pint bottle—not out of those bottles they found in the car. They were left after a party about two weeks before the accident, and were still in the car. I couldn't exactly say how fast I was driving on Western, but I imagine I was driving between 30 and 35 miles, when I came under that underpass."

Officers Burke and Ridge, recalled, testified that none of the boys said that the car that drove into Nichols Hills had green shades over the headlights.

At the conclusion of all the evidence, the defendant moved the court to instruct the jury to return a verdict of not guilty, for the reason the evidence was wholly insufficient to sustain a conviction. The motion was denied. Exception reserved.

The errors relied on, and upon which the defendant asked for reversal, are as follows: That the court erred in admitting incompetent, irrelevant, and prejudicial evi-

dence; that the court erred in overruling the demurrer of the defendant to the evidence of the state, and in refusing to instruct the jury to return a verdict of not guilty at the close of all the evidence.

It is insisted that "the court erred in permitting the arresting officers to testify over defendant's objection as to an extrajudicial identification of the defendant"—citing Johnson v. State, 44 Okla. Cr. 113, 279 Pac. 933, and McCandless v. State, 49 Okla. Cr. 116, 295 Pac. 412.

With this contention we do not agree. The facts in the case at bar do not bring it within the rules announced in the cases cited; that extrajudicial identification of a defendant is generally inadmissible, and that prior consistent statements of a witness are inadmissible to corroborate him when he has been attacked by showing his prior inconsistent statements.

It appears that some of the testimony objected to was hearsay; as to facts that were not disputed by the defendant, he admitted that about 45 minutes before the officers arrested him he drove his car north on North Western avenue, passing under the underpass, turning into Nichols Hills, and as a witness in his own behalf he so testified.

It is true the defendant denied hitting any one. The witnesses Haynes, Veatch, and Conray described the car, and the witness Emerick positively identified the defendant's car as the one which was driven at the time the accident occurred. It appears that the defendant continued his flight away from the scene of the accident until he arrived at his home.

The testimony of the officers, Ridge and Burke, detailed steps taken in searching for the car and its driver;

their examination of the car and their conversation with the defendant before arresting him.

In the case of People v. Ogle, 104 N. Y. 511, 11 N. E. 53, an indictment for murder, the Court of Appeals of New York held:

"The testimony of officers, detailing the steps taken in searching for and arresting the accused, is admissible for the purpose of proving his flight."

It is also insisted "that the court erred in permitting the officers to testify that the defendant was drunk at the time he was arrested and that there were whisky bottles in the car."

Counsel in their brief say:

"It is our contention that evidence that defendant was intoxicated, was evidence tending to prove another crime in no way connected with the crime of which he was charged."

The rule is universal that the parties in the trial of a cause are at liberty to impeach the testimony of a witness by showing that he was intoxicated at the time of the events about which he testifies. In the case of Prochneau v. State, 32 Okla. Cr. 210, 240 Pac. 1090, 1091, syllabus 3, this court said:

"A witness' testimony may be impeached by showing intoxication at or about the time of the transaction testified to, not only by the evidence of other witnesses, but by cross-examination of the witness himself."

It cannot be said that the testimony objected to, standing by itself, had no logical bearing upon any fact involved in the issue upon which the defendant was being tried. It went, not only to his credibility, but also to his capacity to know and remember with accuracy what took place at

the time of the accident. It is a matter of common knowledge that a person under the influence of intoxicating liquor is more likely to be reckless and careless in driving a car than one who is duly sober, and that, when intoxicated, such persons often have little or no regard for the lives of other people or for their rights. For this reason the law makes it a felony for any person who is under the influence of intoxicating liquor to operate or drive motor vehicles on any highway within the state.

The rule is well settled that evidence is admissible that tends directly to prove the defendant guilty, although it may also tend to prove a distinct felony and thus prejudice the accused. In support of this rule see Carmack v. State, 44 Okla. Cr. 171, 279 Pac. 964. In syllabus 1 and 2 this court said:

"In a criminal prosecution, evidence which is relevant to the issue is not rendered inadmissible by reason of the fact that it tends to prove the defendant guilty of a crime other than the one charged in the information.

"Evidence of a different offense from the one charged is admissible, when both offenses are so closely linked or connected as to form a part of the res gestae."

It follows that the contention made is without merit.

Other questions are raised as to the admissibility of certain testimony; we have examined them and find they are without merit.

There can be no doubt as to the sufficiency of the evidence to sustain the verdict; the testimony of the defendant in his own behalf is in effect a plea of guilty as charged. However, we are inclined to think that the maximum punishment imposed by the court is excessive.

It is both the spirit and intention of our laws that punishment for crime shall be imposed for the protection

of society and reformation of the criminal. In this case we are of opinion that substantial justice requires a modification of the judgment and sentence to imprisonment in the county jail for six months, and a fine of $250, and in default of payment of the fine the defendant to be imprisoned for a further period not exceeding one day for each dollar of the said fine.

As thus modified, the judgment is affirmed.

DAVENPORT, P. J., and EDWARDS, J., concur.