## DRAKE v. STATE.

No. A-11146.   April 5, 1950.

(217 P. 2d 191.)

Ryan Kerr and Gore & Gore, Altus, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

BRETT, J.  The defendant below, Floyd Drake, was charged by information, tried by a jury, convicted of the crime of maintaining a public nuisance in Room 427 of the New Orient Hotel in Altus, Okla., on February 14, 1948, where equipment was provided and persons congregated to play at such gambling games as poker played with cards, and craps played with dice, for money, checks, etc.  A trial was had in the case on April 6, 1948, and the jury finding the defendant guilty, fixed his punishment at a fine of $500, and judgment and sentence was pronounced accordingly.

The statute under which the charge was laid is § 946, Title 21 O. S. 1941, as follows:

"Any house, room or place where any of the games prohibited by Section 1 of this Act are opened, conducted or carried on, or where persons congregate to play at any such games is a public nuisance and the keepers and managers of any such nuisance, and persons aiding or assisting any such keepers or managers in keeping or managing any such nuisance shall be guilty of a felony and upon conviction, shall be punished by a fine of not less than five hundred dollars nor more than ten thousand dollars or by imprisonment in the State Penitentiary for a term of not less than one year nor more than ten years."

In the foregoing section 946, Title 21 O. S. 1941, reference is made to the provisions of section 1 of this act

which has reference to the provisions of section 941, Title 21 O. S. 1941, which defines the games prohibited by said act. It reads in substance in relation thereto as follows, to wit:

"Every person who opens, or causes to be opened, or who conducts, whether for hire or not, or carries on either poker, roulette, craps or any banking or per centage, or any gambling game played with dice, cards or any device, for money, checks, credits, or any representatives of value, * * *."

Originally, Floyd Drake and Lee Walker were jointly charged herein but a severance was granted and Floyd Drake appears herein only as the defendant. Preliminary to the hearing herein the defendant interposed a motion to suppress the evidence on the grounds that the same was obtained under an unlawful search and seizure. Evidence was offered on the same, and the same was by the court overruled. No question is raised on this appeal by reason thereof. We make reference only to the same because of the fact that the same will be referred to hereafter incidentally to a consideration of the evidence.

The defendant's first contention is that the evidence is insufficient to support the conviction. In this connection the record discloses on behalf of the state that C. W. Stamey, manager of a construction company, a friend of the defendant, and who lived in Kansas but who had been stopping at the New Orient Hotel about 18 months, testified substantially as follows: That some time in February, 1948, the defendant indicated to Mr. Stamey that he wanted to have a conversation with him, whereupon Mr. Stamey went to Room 427 in the hotel where the alleged gambling house was operated. Floyd Drake was there alone, he said, and seemed to be in somewhat of a disturbed state of mind. He stated to Mr. Stamey he was

just wondering whether it paid him to stay up there, that he "could not make anything". He further said that defendant, Drake, had reference to the clubroom located at Room 427 in the New Orient Hotel in Altus. He further stated that Drake was wondering if he had anything that he might do. Mr. Stamey told him he could put him on the big "cat" (meaning a caterpillar tractor). Mr. Stamey was asked if the defendant stated to him how much he was making in connection with the clubroom, and he said Drake told him about $100 a week was about as much as he could do. Drake said that he was not making as much as he could make at his trade as a welder. The defendant did not cross-examine Mr. Stamey in connection with the foregoing evidence. It is interesting, however, to note the cross-examination of the defendant. He was asked with reference to the conversation with Mr. Stamey, "Q. He told you why take a chance getting in dutch with the law when he could pay you for running a cat out there. He could pay you that much and you could make an honest living, did he tell you that?" The answer in this connection is most revealing, he says, "I can't remember".

Jack Kaufman testified that he lived in Altus, said he did not personally know Floyd Drake but had seen him once in Room 427 at the hotel. He testified that he had never seen the defendant engaged in any gambling at the room; that he had never engaged in any but that he had a membership card in the club; that he had been up there on three different occasions and rolled dice. On these occasions Walker was there but Drake was not.

Next, the state offered Roscoe Meyer who testified he had a membership card which cost him $1, and when he procured it he was provided with a mixed drink. He

further said that he later became engaged in a crap game. It was the third time he was in the clubroom. The defendant Floyd Drake and Lee Walker both played in that game.

Verna May Brady testified that at the time in question she was the bookkeeper at the New Orient Hotel, that she had seen Drake in the lobby of the hotel practically every day but he was not registered at the hotel. She did not know what his business was in the hotel though she had seen him on occasions in Room 427. She testified that Room 427 was rented to Walker and as far as she knew to him only. She further testified that if the defendant had anything to do with the clubroom it was unknown to her.

E. P. Shepard was the next witness called by the state. He testified that he was a club member and that he had been up there twice. He said the occasion for his going was that he went with a party who wanted to get a drink. He said when they went to Room 427 the defendant, Floyd Drake, was sitting at a table shuffling cards, that he did not know what the game was that they were playing. He said he did not see any gambling.

The next witness was Albert Kaufman, who testified he lived near Olustee and that his occupation was that of a farmer. He said he had known Floyd Drake for more than 20 years. He further testified that he was a card carrying club member; which membership he bought from Lee Walker for the price of $1, in November, 1947. He said Floyd Drake was present when Walker sold him the card. He too said when he purchased his card he got a drink. The first time he was there he said he gambled but not with Walker or Drake. The second time he was in the clubroom was on or about December 14 about 9

o'clock at night. He said he gambled with Floyd Drake, John Parker and Lee Walker; that he lost about $15 in cash and wrote a check for $50 to cover the balance of his losses. He further testified that when he went up to the club he had about $15 and when he lost that he wrote a check for $50. He finally lost that and wrote another check for $100. He continued to increase these checks $50 at a time until he had written checks in the total sum of $250. He said he wrote one check for dice in the sum of $50, and one check in the sum of $50 with which to play poker. As he continued to lose and raise the amount of his checks, the checks for $50 and $100, etc., were supposed to have been destroyed. He said he made these checks out to Floyd Drake and that three of these checks came back through his bank account endorsed by Floyd Drake. The $250 check was made out to Floyd Drake. It was made out by him and endorsed by him. He identified the $50 check as made out by Lee Walker. All of the money that was received on these checks was paid out to him by Floyd Drake who apparently was acting in the capacity of banker for the games. He said that one of the $50 checks was not torn up and had been raised to $150. He said that he complained to Lee Walker about this check and told him he would tell the county attorney all he knew about the situation if they did not get him his money. He said he didn't mind paying his losses, but the $150 check was what he did not like. He said when he would write the check that he would write and give it to Lee Walker. Lee Walker in turn gave it to Floyd Drake and Floyd Drake gave him the money on it. He said after the occurrence he contacted Drake about the situation and Drake would tell him he gave it to Walker and when he would contact Walker, Walker would tell him he gave it to Drake. Kaufman further

testified that Floyd Drake and Lee Walker were running the place, and that on three different occasions he had drunk liquor at the club, and that Floyd Drake gave him some of these drinks; that every time he was up there Floyd Drake and Walker were both there.

The next witness for the state was Robert Bilbrey. He testified that he too was a member of the club and had a membership card which he got from Walker; that he paid $1 for the card and got a drink of some kind; that he thought it had whisky in it. He said some time before Christmas, or in January, he was in a poker game with Drake and with a man by the name of Winfred Lindsey and another man he did not know. He said before the game started Lee Walker pitched a deck of cards on the table. He said he too got a drink there but he did not remember who furnished it. He said Floyd Drake was present when he was there.

Roy D. Baker testified for the state that he had a membership card for which he paid a dollar, and at the time of the purchase of the same he too got a drink which tasted like it contained alcohol. He said he had attended the clubroom on two occasions and Drake was not there.

The next witness for the state was A. B. Boaldin, sheriff of Jackson county. He testified to the raid on the night of February 14, 1948. He said when he raided the place under the authority of a search warrant a poker game was going on in the room between two men by the name of Edwards and Lavender. He said that Walker was not present but Floyd Drake was there and was using the telephone. Under his search warrant he said he seized 24 chairs, 5 tables, the deck of cards they were playing with, dice, leather cups and 4 quarts of whisky.

Witness Edmond Edwards testified that he was a member of the club operated in Room 427 of the New Orient Hotel, that he purchased his card from Floyd Drake; that at the time he procured his membership they passed him a drink over the bar. He said that the night he was in the clubroom he played poker with a man by the name of Pike and Floyd Drake.

Walter Clounts testified he bought a membership card from Drake for the price of $1, and that he too was served a drink. He said that was his only participation at the club. He said there was no one present at that time except Drake and the negro porter.

John Parker testified that he was not a member of the club but he accompanied A. D. Kaufman, a member of the club, to the same about December 14, 1947. He said while he was there he saw gambling consisting of craps and poker. He said Floyd Drake was engaged in the poker game. He said he remembered Mr. Kaufman writing checks and giving them to Drake during the crap game. Drake cashed the checks and gave the money to Kaufman.

Audie Derryberry said he was not a member of the club but early in February he went to the club with another person and while there he saw Lee Walker and Frank Massey shooting craps and that he too engaged in the game.

Nelson Lavender testified that he was a member of the club and that his card evidencing his membership cost him a dollar but that when he purchased it he got a drink which could have been an alcoholic drink. He said he had been to the club two or three times and that he was there on the night of February 14, 1948, when the sheriff raided the place, and that on that occasion

he saw both Lee Walker and Floyd Drake gambling, and this was the same night that Mr. Pike and an investigator from Oklahoma City was playing.

Parker Brawley testified he was a member of the club, that he had gambled there on two occasions by playing poker. He said he paid a dollar for his membership card and got a drink with it. He did not remember from whom he bought his membership card.

Halen Saleny testified that he held a membership card which cost him a dollar. He did not remember who sold him the card but said that he was offered a mixed drink but declined it when he bought his card. He testified he had played poker in the clubroom with Albert Kaufman and Parker Brawley. He did not recall whether there was a takeoff in the game.

Jimmie Aboussie said he held membership in the club and had been there on several occasions but did not see any gambling while he was there. He said Lee Walker sold him his card, that he was offered a mixed drink but, declined it, and took a Coca Cola or 7-Up instead.

To the foregoing evidence the defendant interposed a demurrer which was by the court overruled. The evidence was entirely sufficient to sustain the trial court in so doing.

The defendant, Floyd Drake, testified in his own behalf. He said that he was a card carrying member, and he joined the club in December, 1947, having purchased his membership card from Lee Walker. He denied having any connection with the management or operation of the club. He further testified that he had only been to the club six or seven times. However, he admitted that he had gambled there. He admitted he sold several mem-

bership cards. In connection with the sale of membership cards his testimony was that if anybody came up and wanted a card because he was a club member he would take the dollar. He admitted that he was acting for Lee Walker when he issued these cards, that Walker told him that when he was not there to go ahead and sell the membership cards. He said he did not know of any other member that sold any membership cards. He said that when he sold these membership cards he took the money and put it in a little cigar box behind the counter. He said that he could not recall that he unlocked this box the night the officres raided the place. He testified he did not get any income out of the place but that "what money I made I gambled a little once in a while, and after I made up my losses I didn't make any money". He denied he ever sold any whisky in the club but once in a while he sold a club membership and he would give the purchaser a drink. He admitted he had a conversation with Mr. Stamey. He admitted that he was the owner of the .45 pistol which the sheriff found in the clubroom on the night of the raid. He said that he had taken the pistol out of his car and carried it up to the clubroom. He also said he had been sitting in the poker game the night the sheriff raided the place. To this evidence the defendant moved for a directed verdict, which was properly overruled.

In an analysis of the evidence, it is clear that a gambling place where games with cards and dice such as is defined in § 941, Title 21 O. S. 1941, was being maintained in Room 427 of the New Orient Hotel in Altus as alleged in the information. The evidence is likewise clear and convincing that the same constituted a public nuisance as defined under § 946, Title 21 O. S. 1941. The only other question presented by the record is, Was the

evidence sufficient to show the defendant connected therewith as keeper, manager or as a person aiding or assisting the keeper and manager of such nuisance? There are inescapable facts contained in the foregoing summary of the evidence that conclusively point to the defendant's guilt of being a manager, keeper or an active aid and assistant in the operation of said gambling place. These conclusive facts are positively revealed by his admitted friend, Mr. Stamey, who testified that the defendant told him his interest in the place netted him the sum of $100 per week. It discloses the defendant was uneasy about his continuing his connection with the gambling place. It further showed he was uneasy as to whether it would pay him to stay. Events, of course, proved his apprehension in this regard was well founded. His take of $100 a week for an unemployed welder would not have formed the basis of his apprehension as to whether it would pay him to stay. In this connection his cross-examination to which reference has hereinbefore been made is most revealing. Certainly he would have remembered the admonition given him by Mr. Stamey about taking a chance in getting in dutch with the law. It is apparent that his faulty memory was prompted by his desire to evade the truth contained in the question. Moreover, the foregoing summary reveals the defendant as an almost constant habituate of the place, selling membership cards, serving alcoholic drinks, as a card shuffler, a participant in games of poker and craps, as the official but untrustworthy banker of the games, as well as being interested to the point of providing personal pistol protection for the place. Finally, it fixes the defendant as the sole person in charge when the raid was made of the place by Sheriff Boaldin.

We have based the foregoing conclusion upon the evidence offered in the trial of the case in chief. It is in-

teresting, however, to note that in this conclusion, we find confirmation thereof in the evidence offered by the defendant, on the motion to suppress the evidence of the state. Therein we find on cross-examination that Mr. Walker made the following statement:

"Q. What connection did Floyd have? A. He had a small connection, I hired him. Q. He had a working interest in the club? A. Yes, a working interest."

The foregoing evidence though conflicting as between that offered by the state and the defendant is sufficient to sustain the verdict of the jury. In Jackson v. State, 84 Okla. Cr. 138, 179 P. 2d 924, 925, it was said:

"Where the evidence is conflicting and different inferences may be drawn therefrom, it is the province of the jury to weigh the evidence and determine the facts."

In the more recent case of Wheaton v. State, 85 Okla. Cr. 132, 185 P. 2d 931, 932, it was said:

"The finding of a jury on a disputed question of fact will not be disturbed on appeal where there is competent evidence in the record to sustain their finding."

The evidence herein is clearly sufficient to support the jury's finding that the defendant, Drake, was guilty as charged in the information. This contention is therefore without merit.

Further, the defendant contends that the court erred in admitting evidence of other offenses committed in the operation of the said clubroom. The defendant contends that it was error for the court to permit proof in relation to serving of mixed drinks of alcoholic content to the members, and that the sheriff seized four quarts of whisky at the time of effecting the raid on the club. He further contends that the court erred in admitting evidence in relation to the finding of the .45 automatic pistol

in the clubroom which Drake admitted belonged to him. The defendant complains that these facts bore no logical connection to the charge as laid in the information, that of operating a public nuisance. He cites numerous authorities in support of this contention. We find the authorities are not in point for the reason that the serving of intoxicating liquor upon the purchase of membership constituted a part of a scheme and plan of operation of the club. It was admissible as connecting him with the operation and management of the clubroom. The evidence of the sheriff in connection with the seizure of the four quarts of whisky was admissible, as constituting part and parcel of the scheme and plan of operation. Moreover, it was corroborative of the testimony of club members who testified that drinks were served upon the purchase of a club membership by them. It was admissible as a part of the res gestae or transaction itself in connection with the operation of the club. In Smith v. State, 83 Okla. Cr. 209, 175 P. 2d 348, 349, this court said:

"To the general rule that the admission in evidence of other crimes, either prior or subsequent to the alleged offense is inadmissible, there are, however, certain exceptions which are as well recognized as the rule itself, as, where the evidence tends directly or fairly to prove guilt of the crime charged, or to connect one with it, or where the crime charged and other offense are closely related or connected; or where such testimony is for the purpose of showing that it was a part of a system or common scheme or plan; or when proof of a separate offense is explanatory of the motive or intent of the offender in the commission of the offense charged."

In Doser v. State, 88 Okla. Cr. 299, 203 P. 2d 451, 454, this court said:

"Evidence of other crimes is competent to prove the specific crime charged when it tends to establish a scheme

or plan or as part of a general conspiracy or is a part of the res gestae * * *, or where it is so closely linked to the crime for which accused is on trial as to throw light on it."

In Bouyer v. State, 57 Okla. Cr. 22, 43 P. 2d 153, 154, this court said:

"Evidence is admissible that tends to prove the defendant guilty of the offense charged, even though it may tend to prove a different offense, when both offenses are so closely related or connected as to form a part of the res gestae.

"Evidence which is relevant to the issue is not rendered inadmissible by reason of the fact that it tends to prove the defendant guilty of an offense other than the one charged in the information."

See, also, Carmack v. State, 44 Okla. Cr. 171, 279 P. 964. Evidence of all of these things was closely related to and connected with the maintenance of the public nuisance herein involved and the same was clearly admissible as a part of the scheme and plan, and so closely linked to the crime for which the defendant was on trial as to constitute part and parcel of the crime itself. This contention is therefore without merit.

Furthermore, the defendant complains that it was error to admit the evidence in relation to the ownership of the .45 automatic pistol found in the clubroom. This was admissible as against the defendant in that it tended to show that he had more than an ordinary interest in the operation, and that he desired to have the pistol there for personal protection. If the defendant only ran in and out, as he attempted to lead the jury to believe that he did, then there would have been no reason for him to keep his automatic pistol on the premises as he was doing at the time the raid was made. The pistol may have

been kept for the very lawful purpose of protection against hi-jacking or otherwise, but it had a logical connection with the charge of operating a public gambling nuisance and was therefore admissible.

The defendant further contends that the court erred in giving instruction No. 4. The objection to instruction No. 4 goes to the proposition that the trial court did not define a similar offense and did not specify with particularity what the court deemed a similar offense. The defendant contends the jury had no legal knowledge to determine such as a matter of law. While it would have been conducive to clarity for the court to have defined what was intended by the expression "similar offense", we do not believe the instruction was misleading since the charge for which the defendant was being tried was that of maintaining a public nuisance, in relation to conducting gambling games in which the defendant participated, in the possession of four quarts of whisky and the dispensation of alcoholic drinks, etc., on the premises, all part of the res gestae. There were no other offenses involved in the case other than those incident to the operation of this gambling place. Since the court limited the consideration of this evidence to the proposition that they could be considered only so far as those facts throw light on the case now on trial, the said instruction was not prejudicial to the defendant's rights. Under the law the court was duty bound to so limit the said instruction. Smith v. State, 83 Okla. Cr. 209, 175 P. 2d 348. While the instruction may not have been as clear as was possible to make it, in any event, even if error, it was only an error of omission and not positive misdirection. In this connection the defendant should have submitted to the court what addition he desired to make the instruction more specific and comprehensive, and requested that it

be given. This he did not do. In the absence of such request a conviction will not be reversed, unless this court is of the opinion in light of the entire record, including the instructions given, that the defendant may have been prejudiced by the instruction complained of. Pulliam v. State, 61 Okla. Cr. 18, 65 P. 2d 426. Such is the situation in the case at bar in relation to instruction No. 4. For all of the above and foregoing reasons, the judgment and sentence herein imposed is affirmed.

JONES, P. J., and POWELL, J., concur.