# LENA GRIFFIN SMITH v. STATE.

No. A-10521.    Dec. 4, 1946.

(175  P.  2d  348.)

210

Herbert K. Hyde and Lee Williams, both of Oklahoma City, for plaintiff in error.

Mac. Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., and George Miskovsky, Co. Atty., of Oklahoma City, for defendant in error.

BAREFOOT, J.   Defendant, Lena Griffin Smith, was charged in the district court of Oklahoma county with the crime of murder; was tried, convicted of manslaughter in the first degree, and her punishment assessed at ten years in the State Penitentiary, and she has appealed.

The information filed charges the defendant with the crime of murder, and in part is as follows:

"* * * did then and there without authority of law, and while engaged in the act of the commission of a felony, * * * did administer to the said Mrs. Naomi Congdon, a pregnant woman and prescribe for said Mrs. Naomi Congdon and advise and procure the said Mrs. Naomi Congdon to take certain medicines, drugs and substances and did use and employ certain instruments and other means with the intent thereby to procure the miscarriage of the said Mrs. Naomi Congdon, to-wit: a speculum and other instruments and drugs and medicines * * * in and upon the body of the said Mrs. Naomi Congdon who was then and there a living woman, pregnant with an unquick child, with the intent then and there on the part of her, the said Lena Griffin * * * by the use and employment of said instruments and things and drugs and medicines as aforesaid, to procure the miscarriage of the said Mrs. Naomi Congdon, but none of which acts or any of them, being necessary to preserve the life of the said Mrs. Naomi Congdon, the said defendant not then and there being a licensed medical doctor and not having legal authority to practice medicine, and the said defendant then and there well knew that the use and employment of said instruments and things and drugs and medicines upon the body of the said Mrs. Naomi Congdon was not necessary to be done by her at that time and place to preserve the life of the said Mrs. Naomi Congdon, and the use of said instruments, drugs and medicines by the said defendant upon the body of the said Mrs. Naomi Congdon was an act which was imminently dangerous to the said Mrs. Naomi Congdon and being made a felony by the statutes of the State of Oklahoma, * * *."

The alleged felony so attempted to be charged is under Tit. 21 O. S. 1941 § 861, as follows:

"Every person who administers to any pregnant woman, or who prescribes for any such woman, or advises or procures any such woman to take any medicine, drug or substance, or uses or employs any instrument, or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the penitentiary not exceeding three years, or in a county jail not exceeding one year."

For a reversal of this case, the following alleged errors are submitted and argued:

"1. Error in the admission of evidence of other alleged crimes, including alleged crimes after the crime alleged in the information here.

"2. Error in the admission of an alleged confession which was not voluntary.

"3. Error in overruling the demurrer to the state's evidence, and error in overruling defendant's motion for a directed verdict, because of failure of proof of one of the necessary elements of the crime charged, i. e., the pregnancy of the deceased.

"4. Error in overruling the demurrer and motion for a directed verdict, because the evidence was insufficient to establish the cause of death of the deceased.

5. Error in refusing to permit to prove antecedent declarations made by deceased which would have tended to establish her death was caused by other means.

"6. Error of the court in submitting to the jury the issue of manslaughter in the first degree, same not being an included offense under the evidence."

A brief statement of the evidence is necessary for a consideration of the above errors.

The deceased, Mrs. Naomi Congdon, was the wife of D. Congdon, a sailor who was stationed at the "south naval base," near Norman, Cleveland county, Oklahoma, and 18 miles from Oklahoma City. Mrs. Congdon was 21 years of age, and had an apartment at 431 West Twelfth street, in Oklahoma City, prior to and on August 16, 1943. The defendant was operating a place of business at 2134 Harden Drive, in Oklahoma City, to which she referred as a home for unfortunate girls, and the state contends was a place where abortions were performed upon pregnant women for a money consideration.

The evidence revealed that this place had been conducted by defendant for a period of 15 years. The deceased went to the place of business of the defendant in the afternoon of Monday, August 16, 1943. She was there treated by the defendant. There is a conflict as to the nature of this treatment, and reference will be made to this conflict in discussing the errors assigned.

D. Congdon, husband of deceased, went to defendant's place of business to see his wife on Tuesday evening, August 17th. He left promising his wife to return later that evening, and when he returned he was informed by defendant that his wife was asleep, and he was not permitted to see her. He went back Wednesday evening, August 18, 1943, and found his wife very sick, and testified that the defendant wanted him to take her away and get a doctor. Mr. Congdon went to the Navy Shore Patrol Headquarters, and Dr. Morris H. Cohen was called, and about an hour later Mr. Congdon and Dr. Cohen went to defendant's home, and Mrs. Congdon was taken to the Navy Hospital at the south base, in Norman, where she remained until August 28, 1943, when she died of "septicemia" due to an abortion, as stated in the certificate of death furnished to

the Oklahoma State Health Department by Dr. R. J. Cooper, of the Navy.

A search of the premises of defendant was made on August 31, 1943, and numerous articles consisting of surgeons' and physicians' equipment, instruments, medicines, etc., were seized by the officers and introduced as evidence in the trial of this case.

A number of witnesses testified, including many doctors. This evidence will be referred to as necessary in discussing the errors assigned.

Under the first assignment of error, it is contended that the introduction of evidence of other abortions performed by defendant subsequent to the alleged abortion on Mrs. Congdon was prejudicial error which should cause a reversal of this case.

It is the general rule as recognized by all the authorities that the admission in evidence of other crimes, either prior or subsequent to the alleged offense, is inadmissible. The citation of authority upon this proposition is unnecessary. 22 C. J. S., Criminal Law, § 682, p. 1084.

To this general rule there are, however, certain exceptions which are as well recognized as the rule itself; as, where the evidence tends directly or fairly to prove guilt of the crime charged, or to connect one with it, or where the crime charged and the other offense are closely related or connected; or where such testimony is for the purpose of showing that it was a part of a system or common scheme or plan; or when proof of a separate offense is explanatory of the motive or intent of the offender in the commission of the offense charged. 22 C. J. S., Criminal Law, §§ 683, 687, 688. These exceptions are often recogniz-

ed in cases where one is charged with the crime of abortion. See cases hereinafter cited.

It is the contention of the defendant in this case that by reason of her defense (that she did not commit the abortion), evidence of other abortions committed on others subsequent to the alleged offense was inadmissible for the reason it was not necessary for the state to prove "intent," "guilty knowledge," or "motive," as the evidence of the state showed these elements by other evidence, and it therefore became unnecessary, and was prejudicial to defendant's rights to permit the introduction of evidence of other crimes.

It may be said in the outset that the authorities are not in perfect agreement on this proposition. The case of State v. Cragun, 85 Utah, 149, 38 P. 2d 1071, cited by defendant, gives a full discussion and review of many cases. Three concurring opinions, and one dissenting opinion are given. We have carefully read and considered this case, together with the many cases cited therein.

We have also examined the two cases decided by this court, Davis v. State, 30 Okla. Cr. 61, 234 P. 787, and Thacker v. State, 55 Okla. Cr. 161, 26 P. 2d 770, cited by defendant. Both of these are abortion cases, and they are very similar to and have many points in common with the case at bar. In both of these cases the defendant was convicted, and the case was affirmed.

In the Davis case, the defendant was a practicing physician in Oklahoma City. The husband and his wife made arrangements with defendant to perform an abortion, and the operation was completed and the woman contracted blood poison as a result thereof, and died. Defendant was charged with murder, after his office was searched and

medicines used to cause miscarriages and many instruments were found. The officers also found a number of statements signed by different parties agreeing to hold defendant blameless for any dangerous or fatal results that might result from or follow his treatment of them. A writing of this character was taken from the husband of deceased. A number of these parties were subpoenaed as witnesses for the state, and all testified that the defendant Davis had performed operations upon them under circumstances indicating that his practice consisted chiefly in performing abortions. One of the witnesses was convalescing from such an operation in one of the beds in the room adjoining the doctor's office at the time of his arrest. Another came there for an operation while the premises were in charge of the officers, and were being searched by them following his arrest. (The facts concerning two of the witnesses testifying in the instant case were identical with the facts here stated.) In the Davis case, the different abortions complained of were performed by defendant three or four months preceding the time of defendant's arrest. The defendant Davis, the same as defendant in the instant case, claimed that all of these women came to him after attempted abortions upon themselves, or after some other person had attempted abortions upon them, and that the only treatment administered by him was such as seemed necessary under all the condition apparent. He also claimed that this was true of the deceased and that he only administered to her such treatment as the case seemed to warrant. This was the identical defense offered by the defendant in the instant case. In the Davis case it was held that the evidence of other offenses was admissible. It was there said (30 Okla. Cr. 61, 234 P. 789) :

"An exception to the rule of evidence that evidence of other offenses cannot be introduced to establish the com-

mission of the offense charged arises where the other offense or offenses tend to identify the accused with the offense charged; where such testimony is for the purpose of showing that the offense charged was a part of a system or common scheme or plan, including other like offenses; or where proof of a separate offense is explanatory of the motives of the offender in the commission of the offense charged."

In the Thacker case, supra, the defendant was a practicing physician in Oklahoma City. He was charged with the crime of murder by reason of an abortion performed on one Ruth Hall. In the trial of this case, the state, over the objection of defendant, was permitted to introduce numerous witnesses who testified to abortions upon other parties by the defendant, subsequent to the abortion performed upon Ruth Hall. Defendant denied the performance of the abortion upon Ruth Hall, or either of the other women mentioned in the record. This court, after citing and reviewing the Davis case, supra, said (55 Okla. Cr. 161, 26 P. 2d 774) :

"Davis v. State, supra, is in point, and following the holding in the Davis Case we do not think the court erred in admitting the evidence of abortions performed on other women about the same time or shortly thereafter it is alleged the abortion was performed on Ruth Hall."

The court also stated:

"The record further shows this defendant wholly disregarded his profession as a physician charged with the duty of carefully examining and treating his patients; that he did not take the pains to look after them, or make any further inquiry about them after they left his office: and it conclusively shows that the defendant was a professional criminal abortionist of such type that he is not entitled to be considered a reputable physician. The jury heard the evidence and decided that the defendant was guilty. This court has repeatedly held that where there is any com-

petent evidence to sustain the conviction it would not disturb the judgment."

Referring to the case of State v. Cragun, Utah, supra, it may be stated that the defendant was there charged with the crime of having "employed an instrument in and upon a * * * married woman * * * with intent to produce a miscarriage." The prosecutrix did not die as a result of the operation, and testified in the case. The defendant in the case at bar was charged with the crime of murder, and convicted of the crime of manslaughter in the first degree. Certain statutes of Utah with reference to the question of one who solicits and agrees to the performance of an operation or abortion, and as to whether they are accomplices and of necessity their evidence should e corroborated, are discussed and construed. The court decides that under the statutes of Utah they are accomplices, and that therefore it is necessary that their testimony should be corroborated. The case was reversed because of erroneous instructions of the court with regard to this question. The Chief Justice in his concurring opinion says:

"I concur in the reversal of the judgment. I do so chiefly on the ground (1) of the inadmissibility of the evidence as to the commission by the accused of an offense similar to, but separate and distinct from, that charged in the information, evidence of an abortion claimed to have been committed or attempted to have been committed by him on another woman eleven months or more prior to the commission of the alleged offense; * * *."

He further states:

"In approaching a consideration of the first ground, I recognize a conflict in the cases on the subject. Some, I think the best-reasoned, cases, deny the admissibility of such evidence."

The Chief Justice then announces the general rule of law heretofore announced, and the exceptions to the general rule, and gives a long review of the facts surrounding that case. The evidence of the "other offense" was one committed by the defendant on another woman eleven months prior to the commission of the alleged offense. The attempted abortion, if made, was not completed, as the party gave birth to a fully-developed eight-months baby, which lived. There was no connection in any way between the two offenses. The Chief Justice said:

"I have thus in some detail characterized the two offenses to show they were entirely separate and distinct transactions and that the one in no particular was influenced by the other."

The Chief Justice does not attempt to say that there are not instances when the exception to the general rule applies. Further in the opinion he states:

"No claim is made that the alleged offense and the prior similar offense constituted parts of one transaction, or parts of a general scheme or plan so related or connected that a complete account of the entire transaction of the one could not fairly be given without also proving the other, or that proving the one necessarily involved proving the other; and, were such claim made, it on the evidence clearly would not be tenable."

In the instant case it is the contention of the state that the evidence of other offenses was a part of a system or common scheme or plan which was explanatory of the motive or intent of the defendant in the commission of the crime charged. Many cases from this court have held that for this reason the evidence of the commission of other offenses is admissible. Boyer v. State, 68 Okla. Cr. 220, 97 P. 2d 779; Spivey v. State, 69 Okla. Cr. 397, 104 P. 2d 263; Capshaw v. State, 69 Okla. Cr. 440, 104 P. 2d 282; Herren

v. State, 75 Okla. Cr. 251, 130 P. 2d 325; Abbott v. State, 78 Okla Cr. 407, 149 P. 2d 514; Byers v. State, 78 Okla. Cr. 267, 147 P. 2d 185.

In the Cragun case, Utah, supra, the Chief Justice goes extensively into the question of the admission of evidence of other crimes, and especially as to the admissibility of this testimony to prove a felonious intent in cases where a felonious intent is an ingredient of the charged offense. He reviews the case of State v. McCurtain, 52 Utah, 63, 172 P. 481, a leading case from the Supreme Court of that state, in which it was held that in a prosecution for abortion under the Utah statute the testimony of another offense at about the same time a like operation was performed upon her by defendant for a criminal purpose was admissible to prove intent. He first attempts to distinguish this case upon the ground that in the McCurtain case the defense was that the operation was admitted and the contention made that it was necessary to save the life of the party operated upon, but claims that in the case under consideration where the proof of its commission necessarily established the criminal intent, or that the intent is a necessary conclusion from the act done, it was error to admit evidence of other acts to prove the intent. The court then discusses the question of "accomplices" which is not involved in this case, and comes to the conclusion that the rule of the court as announced in that case with reference to "accomplices" should be overruled.

Two other Justices of the Supreme Court of Utah wrote concurring opinions in this case. Justice Moffat concurred in the concurring opinion of Chief Justice Straup. Mr. Justice Ephraim Hanson, who wrote the majority opinion, adhered to the decision in State v. McCurtain as to the question of accomplice, and Justice Elias Hanson

concurred in this opinion, but dissented to a part of the majority opinion, agreeing to the views expressed by Justice Folland in his dissent as to that part of the majority opinion which held that evidence of another attempted abortion was admissible only in rebuttal and was in accord with the view that such evidence was relevant to the issue of intent.

It will thus be noted that two of the five Justices held that the evidence of other offenses was admissible in chief upon the issue of proving "intent," and Justice Ephraim Hanson, who wrote the majority opinion, was of the opinion that such evidence was admissible on rebuttal.

In the instant case, one of the state witnesses, Mrs. Pope, testified in rebuttal, and it is contended by the state that this evidence was admissible on rebuttal to contradict the testimony of the defendant that she did not perform the abortion on the witness.

We are of the opinion that the cases of Davis v. State, supra, and Thacker v. State, supra, by this court, are decisive of the issue here involved. The facts in those cases are very similar to the facts in the instant case. They are in accord with the dissenting opinion of Justice Folland in the Utah case, and really with the majority of the court on the question here involved.

The best-recognized authorities are cited in the Utah case, and the reasoning is so sound, we quote therefrom as follows: (Folland, Justice, dissenting):

"As a general rule, proof of the commission by defendant of another offense wholly unconnected with that for which he is on trial must be excluded. This rule, however, is subject to the exception, among others, that, whenever motive, knowledge, or intent constitutes an ingredient of the offense charged, evidence is admissible of acts or con-

duct of the accused which tends to establish such motive, intent, or knowledge, notwithstanding the fact it may disclose another crime. The author of Underhill on Crim. Ev. (2d Ed.) p. 602, speaking with reference to the charge of abortion, says: 'An abortionary intent must be proved. * * * Evidence that the accused prior, or subsequently, to the act alleged, had attempted to procure an abortion on the same woman, using the same or different means, or that on other occasions he had operated on other women, or held himself out as being able and willing to commit an abortion, is always admissible to show his purpose and intention in connection with the act charged.'

"Mr. Wigmore in 1 Wigmore on Ev. (2d Ed.) at page 667, speaking of abortion, says: 'The intent principle (ante, Sec. 302) is available; other occasions of using such instruments or drugs, whether prior or subsequent, tend to negative an innocent intent.'

"In State v. Rowley, 197 Iowa 977, 195 N. W. 881, 882, the court says: 'The fact that appellant may have performed other similar acts closely connected in time with the act in question, and that such acts were performed with the intent to produce miscarriage, and that the same was not necessary to save life, would have a legitimate bearing upon the question of the intent of appellant in the instant case, if the jury believed the evidence of the state to the effect that the act was in fact performed.'

"The author of 2 Jones' Comm. on Ev. (2d Ed.) p. 1161, in speaking of the relevancy of other acts for the purpose of proving intent, gives reason therefor as follows:

" 'The intention with which a particular act is done often constitutes the burden of the inquiry, and to prove the intent it becomes necessary, in many instances, to extend the examination beyond the particular transaction concerning which the accused is upon trial. For the purpose, therefore, of proving intent, not of proving the act itself, it is often permissible to show other criminal transactions of the same sort springing from like mental condition. Bishop, in his work on Criminal Procedure, after

giving various illustrations as to the proper application of this rule in criminal practice, sums up his conclusion in the following words:

" 'It is, that though the prisoner is not to be prejudiced in the eyes of the jury by the needless admission of testimony tending to prove another crime, yet whenever the evidence which tends to prove the other crime tends also to prove this one, not merely by showing the prisoner to be a bad man, but by showing the particular bad intent to have existed in his mind at the time when he did the act complained of, it is admissible; and it is also admissible, if it really tends thus, as in the facts of most cases it does not, to prove the act itself.' "

"Notwithstanding the general rule that this kind of evidence is relevant to the issue of intent, the cases are not in accord as to its application, as already shown by Mr. Justice Ephraim Hanson. One line of cases holds that, where the element of intent is an essential ingredient of the crime charged, and must be proved by the state, evidence of other abortions, or attempted abortions, is admissible, because relevant to that issue, as part of the state's case in chief. State v. McCurtain, 52 Utah 63, 172 P. 481, 482; Clark v. People, 224 Ill. 554, 79 N. E. 941; People v. Hagenow, 236 Ill. 514. 86 N. E. 370; People v. Schultz-Knighten, (277) Ill. 238, 115 N. E. 140; People v. Hobbs, 297 Ill. 399, 130 N. E. 779; State v. Newell, 134 Minn. 384, 159 N. W. 829; State v. Rowley, 197 Iowa 977, 195 N. W. 881; State v. Brown, 3 Boyce (Del.) 499, 85 A. 797, 800; State v. Doty, 167 Minn. 164, 208 N. W. 760, 761; Rex. v. Graham, 9 B. R. C. 129 (1915) Vict. L. R. 402; Rex v. Bond, 9 B. R. C. 92, (1906) 2 K. B. 389. Other cases hold that evidence of other abortions, or attempted abortions, becomes relevant, competent, and material only when the defendant has testified or otherwise indicated that he admits the act charged, but denies criminal intent by assigning some other excuse or justification for doing the act. People v. Seaman, 107 Mich. 348, 65 N. W. 203, 61 Am. St. Rep. 326; People v. Lonsdale, 122 Mich. 388, 81 N. W. 277; People v. Hodge, 141 Mich. 312, 104 N. W. 599, 113 Am. St. Rep. 525; People

v. Hickok, 56 Cal. App. 13, 204 P. 555; Clark v. Commonwealth, 111 Ky. 443, 63 S. W. 740.

"I am not inclined to accept as law the rule announced in the prevailing opinion, for the reason that I think it basically unsound and not supported by the weight of authority, and for the further and more important reason that this court is committed to the contrary doctrine by its decision in State v. McCurtain, supra."

We are, in our opinion, committed to this doctrine by the Davis and Thacker cases, supra.

The opinion further states:

"The cases already cited support the view that, where the act itself is not admitted, the jury should be carefully instructed that evidence of other abortions, or attempted abortions, is limited to the question of intent, and is not to be considered in determining whether or not the defendant committed the act charged. State v. Brown, supra: The following is pertinent from State v. Doty, supra: 'There was evidence of two other abortions performed about the same time. Such evidence is competent in this class of cases for the purpose of showing a willingness and readiness, or a guilty or criminal intent. 1 C. J. 329; 1 Wig. Ev. (2d Ed.) §§ 302, 359; State v. Newell. 134 Minn. 384, 159 N. W. 829, and cases cited. Such evidence is to be restricted to the limited purpose for which it is received. It is to be distinguished from evidence objectionable as proving merely other crimes. The danger of it is that a jury may convict because, though guilt of the crime charged is not proved, it is satisfied to convict because of other crimes. The court carefully cautioned the jury as to purposes of the testimony and how it should be considered.' "

This practice was followed in the instant case, and the jury was properly instructed as to the limited purpose for which the evidence was admitted. Instruction No. 14 was as follows:

"You are further instructed that the court has permitted to go before you testimony relating to other alleged offenses than the one charged in this Information. In this regard, the court instructs you that you must not consider any evidence of or concerning any other alleged offense charged to have been committed by the defendant except insofar as it tends to prove that the defendant committed the offense charged in this case and you will not be justified in finding the defendant guilty in this case merely because you believe the evidence shows that she may have been guilty of some other offense. The court has allowed to be admitted for your consideration evidence regarding other alleged offenses for the purpose of showing a scheme or plan, if any existed, an unlawful intent or motive, if any, or, to explain a particular course of action; and if you do not find that such evidence as may have been admitted on this subject tends to connect the defendant with the offense charged in this case, then, it is your duty to disregard the same; for it does not matter how many other offenses the defendant may have committed, you must not find her guilty unless you are convinced by the evidence beyond a reasonable doubt that she is guilty of the offense charged in this case."

We therefore hold that it was not error to permit proof of other offenses as revealed by the facts in this case to be introduced.

The second contention is that the court erred in permitting to be introduced in evidence a statement made by defendant in the presence of the county attorney and other officers, after her arrest. It is contended that the statement was not voluntary, and that defendant was not advised of her constitutional rights prior to the making of the statement. This statement was made after her arrest and after the officers had brought her from her place of business to the county court house. The statement was made in the form of questions propounded by the county attorney be-

fore a notary public and taken down by a district court reporter.

The statement is as follows:

"Q. Lena, I want to ask you some questions in connection with the matters and things that you have been arrested for and you can make them freely and voluntarily if you desire to, do you? A. I don't know what I am arrested for yet. Q. Well, you are arrested in connection with attempting to perform an abortion on one Mrs. Pope and seeking to make arrangements for an abortion on one Mrs. Stewart who was at your home this morning, and also in connection with the aiding of a sailor's wife at the Norman Army Post, the Norman Naval Base; do you care to make a free and voluntary statement in connection with that? A. I had better not talk until I can get me an attorney. Q. You would rather talk about it when you have an attorney? A. Yes, sir. Q. You were present this morning when the officers came out and arrested you, were you not? A. Yes, sir. Q. Mrs. H. L. Pope from Walters, Oklahoma, was there, was she not? A. Yes. Q. You accepted $200 from her for the purpose of performing an abortion upon her, did you not, for $200 cash? A. Yes. Q. And you had administered some— you had done some things toward effecting the abortion upon Mrs. Pope, at the time the officers arrived, had you not? A. I would rather not talk; I just don't want to make any statements. Q. Well, didn't you get this, the prober or whatever it is, in her? A. Yes, but she wouldn't hear of it; she could go ahead, she could have gone ahead and had it. Q. She could have gone ahead and aborted without you probing her? A. No. Q. Why did you put that in her? (No answer) Mr. Bob Turner: Lena, you have told us all about it anyway. Q. (By Mr. Miskovsky, continuing) Lena, if you want any consideration out of us, you are going to have to co-operate and if you don't, all right, I will go down and let you go to jail because I have got everything I need. A. I am getting so nervous and sick, I can't hardly say anything; if you would give me a little time—(witness interrupted) Q.

Well, just tell us the whole deal about it in connection with this Mrs. Pope. A. Yes. Q. All right; just tell the reporter. A. I didn't have the treatment large enough I thought would do any good and I told her I didn't have the size she should have. Q. Why did you get a larger size? A. Well, because, that wasn't large enough. Q. She was five (5) months gone, was she not? A. Yes, and she told me she was four (4). Q. She told you she was four (4) months gone? A. Yes. Q. Would it take a larger one with one that's that far gone? A. Yes, it would. Q. And you needed a larger one than you had? A. Yes. Q. What size one did you place in her? A. Well, I put in three (3) small ones; three (3) little bit of ones. Q. Three little bit of ones? A. Yes. Q. And at the time the officers came, those was in her? A. I presume they was. Q. How long before the officers came, was it, that you placed those in her? A. Oh, about an hour or a couple of hours. Q. A couple of hours before the officers got there? A. Uh-huh; uh-huh. Q. Were those placed in there for the purpose of aborting this girl? A. Yes. Q. Prior to the time that you placed—what you call these instruments, these three (3) things you put in her, what do you call them? A. Catheters. Q. Prior to the time that you placed those in her, did she pay you $200? A. Yes. Q. After the officers arrived and searched the house and the place and placed you under arrest and searched your premises you told the officers, that is, Frank Lynch and Bob Turner, that she has paid you $200 cash for the purpose of performing an abortion on her, did you not? A. I don't know who I talked with. Q. Well, this man here (indicating) and this man here (indicating)? A. Yes. Q. Did you not? A. Yes. Q. And they asked you about getting the $200, did they not? A. Yes, I was asked about that. Q. And did you do all that? A. Yes, sir. Q. That was in currency, was it not? A. Yes, sir. Q. In connection with this other lady that was there, a Mrs. Stewart—Mrs. Lloyd F. Stewart, did she come out to see you about an abortion? A. Yes, but I wasn't going to take her. Q. You were not going to take her? A. Because she was too sick. Q. She was sick? A. Yes, she had what's called 'pernicious vomiting';

it's a toxic condition caused by being pregnant, that all women have it. Q. Lena, how long was this Mrs. Stewart there before the officers arrived? A. She just got in. Q. Did you discuss the abortion with her? A. No, I asked her what she—told me that—I asked her what made her look so sick. Q. And what did she say? A. Well, it seems to me she said she had been taking everything in the world, that she always was sick when she got pregnant; I just can't recall what she said exactly because she just got in. Q. But you hadn't made any deal to abort her at the time any officers had come? A. No, I did not. Q. You hadn't had an opportunity to talk to her enough? A. I had talked to her but I wasn't going to take her. Q. You wasn't going to take her? A. I decided she was too sick. Q. Now, then, Mrs. Griffin, in connection with this sailor's wife who died, did you administer aid to her? A. Well, I didn't have to abort her because she was already coming sick. Q. What was her name? A. Mrs. Congdon, Naomi Congdon. Q. When did she first come there to your place, Mrs. Griffin? A. Well, she come there about ten (10) days ago; I just don't recall the day. Q. Did she come alone? A. Yes. Q. What conversation did you have with her at the time she got over there? A. Well, I just don't recall; she told me all the stuff she had been taking and she was quite ill and was sick when she got in there. Q. Did you observe from her she was pregnant? A. Yes. Q. And she had been taking some medicines to attempt to abort herself? A. Yes. Q. And did she tell you that she wanted some assistance in that respect? A. Yes, sir. Q. Did you enter into—that is—an agreement with her to administer to her for that purpose? A. I didn't have to administer to her for that purpose. Q. Did you enter into an agreement for a monetary consideration for aid to be rendered by you? A. Yes, yes. Q. How much was the consideration agreed upon? A. $50. Q. Did she pay you $50? A. Yes, sir. Was that by cash or check? A. It was a check; her check. Q. It was a check? A. Yes, sir. Q. Now, then after you were paid $50 by her for the purpose of administering to her, what was done? A. Well, I examined her and found out she was miscarrying, herself; she had already gone into

a miscarriage. Q. And where did you examine her? A. Beg pardon? Q. Where did you examine her? A. Where? Q. Yes, in what part of your house? A. In my operating room. Q. Did you place her on your operating table? A. Yes, sir. Q. And did you use—what do you call that instrument you open? A. Speculum. Q. You used that? A. Yes. Q. To examine her? A. Yes. Q. What did you discover? A. I found that she was passing; sloughing off. Q. Did you attempt to open up the womb any? A. No. Q. What did you do? A. Well, I put her back on the table and packed her in ice; I mean, I put her back in bed and packed her in ice. Q. Packed her in ice? A. And so, I called her husband to come over there; I said: 'I believe you had better take her to the hospital there, that's my—' she told me she had chronic appendicitis. Then she told me that she had drank two (2) bottles of, or several bottles of turpentine and she drank that in two (2) days and that she drank one (1) little bottle—about like that (indicating), I guess—and we talked along and she just said: 'See how sore my mouth is.' Q. Did she tell you that before you started administering to her? A. No, I wouldn't have to administer anything to her. Q. Well, did you give her any medicine? A. Well, I gave her a purgative which was C. R. C. Q. Which was C. R. C., and what other kind of medicine did you give her? A. For chills. Q. Didn't you give her some quinine? A. No, I didn't have any quinine. Q. Didn't you tell the officers, coming down, that you had given her some quinine? A. I might have, a few doses, but you can't hardly give quinine. Q. Did you give her any quinine? A. I just don't recall; it seems like I did. Q. Do you remember how much quinine you gave her? A. Five grains, I think. Q. Five (5) grains of quinine? A. Supposed to give them every four (4) hours. Q. Are supposed to give them every four hours? A. Yes. Q. Do you remember how many doses of quinine you prescribed for her? A. I just can't tell you because I didn't have that many in the house. Q. Do you remember you did give her some quinine on more than one occasion? A. I can't recall that; it don't seem to me like I had any; I might have given her some; I can't swear that I even gave her any. Q.

What was the purpose of giving her quinine? A. Well, she was having chills; she had an awful hard chill, a very hard chill and so, I thought, maybe, she was having malaria or something, you know and I gave her some quinine but I gave her something to quiet her, that's what I gave her, some sodium amitol. Q. Did you also give her some sodium amitol in addition to the purgative and the quinine? A. Yes. Q. When did you give her the sodium amitol? A. Well, I just can't recall that; I gave her two (2) doses of sodium amitol. Q. Is that a sort of a narcotic? A. Well, that's something that serves to quiet your nerves. Q. How long had she been there before you gave her the sodium amitol? A. Oh, about three (3) hours, I imagine. Q. Was that after you gave her the quinine? A. Oh, yes, I think before that; no, it wasn't because they gave her that sodium amitol and she said her side hurt her so bad, why, 'to give me something to quiet me', and then, I packed her in ice when they said that she had had an attack of appendicitis. Q. Did you examine her womb or her anatomy after that? A. No. Well, just after that, I examined her. Q. Did you pack her with anything? A. No, sir, I did not. Q. Clean her out with anything? A. No, I didn't try to go in there because I didn't know what I was going in and up against; I couldn't do that, you know; nobody could do that. Q. What else did you do in addition to the medicines that you gave her? A. Packed her in ice. Q. Well, did you give her a douche? A. Yes, I gave her a douche. Q. At the time you first examined her? A. No; no, later. Q. Later? A. Yes. Q. Then, you did have her—did you have her on the operating table for that purpose? A. No, not to give her a douche; you wouldn't put her on the operating table to give her a douche. Q. Does the use of quinine in your business sometimes facilitate the passing of the blood? A. Yes; uh-huh. Q. And the substance through the womb? A. Yes; it does that after it starts to pass; it helps them but it don't make them that way. Q. You used it, though, in this instance with the administration or the administering of quinine to help make this pass. A. Yes. Q. And is that the purpose that you gave it to her for? A. Yes, sir. Q. Do you use quinine on your patients quite often? A. Well, not lately

because you can't do that. Q. It's hard to get? A. Yes.
Q. Lena, how long have you been in this business of aborting these pregnant people? A. Oh, let's see, I guess 15 years, I imagine, out there on that corner. Q. Would you hazard a guess as to how many—without naming the people—as to how many women you have aborted in the past fifteen (15) years? A. I don't think I could. Q. Well, would you say, roughly, how many? A. No, I couldn't. Q. Well, it is over, way over a hundred? A. Oh. yes. Q. Several hundred? A. I expect it is. Q. Several hundred. What's your usual charge, Lena, for performing an abortion? A. Well, different prices. Q. Could you tell me why you made a deal to charge the Pope woman $200 and only charged the sailor's wife $50? A. Well, the reason I done that is because I was nursing the sailor's wife; I was trying to help her. Q. You told me this Stewart woman, did you not, that if you accepted her case, it would be $50? A. No, I didn't get any chance to talk to her much; I will tell you, I asked her, what I asked her; I recall, now what I asked her; I asked her why it was she was so sick; you know, she was rather sick when she got in there. Q. Well, you charged this Pope girl $200, was it because she was so far gone that you charged her $200? A. Well, that's one of the reasons and not only that, but because of the situation she was in. Q. What was her situation? A. And I think she has got an infection, besides, I think she has got a gonorrhea infection; I am not actually sure, of course, I don't know. Q. Did she look like she might have had a gonorrhea infection? A. Yes, she did and that, I think, is one of the reasons she wants to have it done but she has never told me that she has it. Q. What is her situation that you speak of? A. Well, she has got a husband in the Army and she is having a child by some body else and she is not married to him. Q. Her husband is in the Army? A. And she already has a child and I don't know how many—two (2), I guess—and she is trying to keep from being disgraced. Q. I see. A. And so, you can't blame her. Q. Now, was that one of the considerations in the $200 charge in her case? A. Yes. Q. Was it an aggravated case? A. Yes. Q. What is your usual charge for aggravated circum-

stances as that? A. $75 and $100. Q. $75 and $100? A. Yes. Q. But to the average married woman who is pregnant and wants to get an abortion, your charge is $75 and $100? A. Yes. Q. But to the girl who is not married and the circumstances are extenuating, you charge more; is that right? A. Well, not particularly; there are a lot of times you have a hard time, you would get harder cases than some of them; if they have never had any children, some times, that's pretty hard. Q. In the Pope girl's case, it wasn't hard, was it? A. With the Pope girl, in fact, she had been there five (5) or six (6) times and told me that situation and I didn't want to take her, really, I didn't but—(interrupted) Q. But you did take her? (No answer) Q. Lena, you say, you have been in this abortion business fifteen (15) years? A. Yes, I guess it's that long; I have been there ever since Troy died—Troy Griffin—I have been out there on that corner. Q. You have been performing your abortions on these pregnant women in connection with any physician or doctor, did you Mrs. Griffin? A. No, sir. Q. You don't have a license to practice surgery and medicine? A. I went away and studied this work. Q. But you have never been licensed under the laws of the state of Oklahoma? A. Oh, no. Q. To practice medicine or surgery? A. No, sir. Q. How long did you study this particular surgery and particular type of medicine before you started practicing? A. Two (2) years. Q. Two (2) years. Where did you study? A. Palestine, Texas. Q. And you have been practicing here in Oklahoma City practically all of your time since then? A. No; no. I didn't. Q. Where else did you practice? A. Well, I mean, I didn't start practicing right away after I landed because I had a maternity hospital in this town—the West Main Hospital—and then I had the Capitol Hill Maternity Hospital. Q. Would you care to tell us any of the other abortions you performed? A. No. Q. Or helped pregnant women? A. No, it might be embarrassing to some people. Q. Have any of your patients died, that you know of, in the past fifteen (15) years? A. No, sir. Q. This is the first one of your patients, the sailor's wife, who died on you? A. Yes, sir. Q. You understand that the performance of

abortions is illegal, do you not, Mrs. Griffin? A. Yes, I do. Q. And you attempted to perform the abortion on Mrs. Pope and administer aid to the Stewart woman with full knowledge of the fact that it was illegal, did you not? A. Yes. I didn't take care of the Stewart woman. Q. Well, you administered aid to her, did you not? A. No, sir. Q. You gave her quinine, did you not; no, the sailor's wife is who I mean? A. Oh, well, I probably did help her. Q. And you knew full well that your acts were illegal, at that time, did you not? A. No, I don't think that's illegal to try to help anyone on it. Q. Oh, you don't think it's illegal? A. I don't know it is. Q. You don't think it's morally wrong, do you? A. No, I don't. Q. But you know that it's contrary to the statutes of the state? A. Oh, yes. Q. You know that, don't you? A. Yes. Q. But according to your code and your aspect and view of the thing, you don't think it's morally wrong? A. Not for what I did for her, I don't. Q. But you know it's contrary to law? A. Yes. Q. And knowing that, you went ahead and administered the aid you gave her, in view of the fact that it was contrary to law and that you knew that? A. Well, I don't know so much about that, but I know you are supposed to give first aid to anybody. Q. But you were not running a first aid institution, were you, there, Lena? A. No. Q. How many times had this sailor's wife contacted you before you attempted to assist her in aborting her or in her pregnancy, aborting herself? A. She had called me on the 'phone and wanted to know if I would take care of her but she didn't tell me that she had all that trouble until after I started taking care of her and I said: 'Well, my land, there is a lot of things the matter with you.' 'Yes,' she says, 'I have no business out here'; she says, 'I ought to go to a hospital and have my appendix removed.' Q. You mean to say that you attempted to administer to her in her desire to be aborted before you learned of the other things? A. Yes. Q. And yet, you administered to her with the intention of aborting her or aiding her in aborting herself? A. Yes. Q. That you thereafter learned that she had all these other complications? A. Yes, that's right. Q. And had you known she had these other complications, you wouldn't

have attempted to assist her in aborting herself? A. I wouldn't have attempted to assist her in her aborting herself and then, I went and got the thermometer and I took her temperature and she was running a 102 temperature. Q. That was how long after you attempted to assist her in aborting herself? A. I think just a few hours. Q. You think just a few hours? A. When she come in there. Q. Had you known that, you wouldn't have attempted to assist her in aborting herself? A. No; no, I wouldn't. Q. How long was she out there after you first started to assist her in aborting herself? A. Well, she was there about three or four hours. Q. Well, I mean, when or how long was she there before she left? A. About 48 hours. Q. She was there only 48 hours? A. Yes, sir. Q. What was the occasion for her leaving? A. Because I called her husband —I didn't call him; he come out there—and I wanted him to take her out of there that night and I said: 'Mr. Congdon, she needs attention.' Then, she hadn't told her husband about taking all this turpentine first and when she told him, he said, 'Well, my God, whoever told you to take such stuff as that?' and she started to tell the woman's name but she didn't finish it. Q. Was her condition pretty bad at that time? A. Yes. Q. Did you remove her—was she removed from your home because of her serious condition? A. Yes, but, she wasn't removed that night; he didn't take her until the next night. Q. Was it over, the aborting complete, before she left there? A. I don't think she passed everything; I don't think so. Q. Did the quinine you gave her help her any in that connection? A. Well. I don't think so. Q. She didn't pull anything? A. Well, I couldn't tell. The only thing I noticed, when she got up, I says, 'Don't go to the bathroom any more, you are so sick,' and, she was vomiting and so, I got the slop jar and when she sat on the slop jar for her bowels to move, it just looked like jello coming from her, that's the way it looked. Q. From her vagina? A. From her bowels. Q. From her bowels? A. Yes, sir; and then, she said to me, she said: 'Do you suppose that that turpentine is doing all of that?' And I said, 'Well, you just put it on the outside of your skin and see how it will burn,' but, he got out there that

night, after I gave her this sodium amitol, of course, she got quiet and went to sleep and when he got back, she was asleep and so, then, he come back, I think the next afternoon about 5 or 6 o'clock; then, she told him what all she had been doing and what she took and I guess she took it because—(statement not completed). Q. How did she leave your place, Lena? A. Well, the Naval Patrol came out there or the Shore Patrol, and got her. Q. Did they come out there at your instance and request or at her husband's instance and request? A. Her husband's. Q. You didn't call any doctor or hospital, did you? A. No, because he wanted to take her out himself; he wanted her to go to this place. Q. How did they remove her from your place? A. Oh, they picked her up and took her out to the car. Q. Did they come after her in an ambulance? A. No. Q. What was her condition at the time she left? A. She was very sick. Q. Probably critical? A. There is a certain way she would move, she would just scream and I don't know whether from her side but they picked her up and carried her out and put her in the car and they was going to take her some place—I never did find out that woman's name they was going to take her to—and then, this Doctor, I presume, I don't know, she came and you know, she came out there to make these calls on her but she was so sick, they didn't leave her at this place; they took her on to Norman to the hospital. It seems like this woman's name was Bowman; it seems like that is the name but they didn't leave her there; they took her on to the hospital that night after they took her out of there. Q. Mrs. Griffin, do you conduct your business purely and strictly on a cash basis? A. Yes. Q. You never accept any accounts or do any work on time? A. No. Q. On a cash basis? A. Yes. Q. But the sailor's wife—what's her name? A. It seems like it's Florence, or Naomi. Q. She paid cash? A. Yes. sir. Q. You don't keep any books or records in your business? A. No. Q. Do you keep any record of your income? A. I haven't had any lately. Q. I mean, for the year '42? A. I didn't make any money in '42; just like that boy said this morning, he left me; he was to look after the place; it is foreclosed and everything and when you can't even keep

your home from being foreclosed that I had done over there, helping him quite a lot. Mr. Miskovsky: OK, that's enough. Now off the record."

(At this time, Mr. Miskovsky interrogates the witness a short time which proceedings are not reported; after that, the hearing continued as follows:)

"Mr. Miskovsky continuing: Q. Here a few weeks back, did some woman have a still-birth child at your house? A. I don't recall anything like that only this girl you are speaking of. Q. What was her name? A. I can get the records downstairs if you like. She lived out at Jones is all I know. Q. What was her occasion for being there? A. Well, she was already flowing, herself, when she come there; I didn't have nothing to do with that. Q. Well, what did you do? A. Well, I just let it pass there like anyone would do. Q. Did you put her to bed? A. Yes. Q. Then what did you do? A. Well, I didn't do nothing; there wasn't anything to do. Q. Did you administer aid to her after the baby was born? A. You didn't have to; just took her home right away, they come after her and took her home. Q. Did you charge her for taking care of her? A. Yes. Q. How much did you charge her? A. I just forget what I charged her because I got some cream and butter from that place and I just don't recall what I did charge her. Q. Did she come over there for the purpose of having an abortion performed? A. No; no, she didn't; she come over there for the purpose of being taken care of. Q. Was she a married woman? A. No, sir. Q. Single woman? A. Yes, sir. Q. Was she pregnant? A. Yes. Q. Anyway, you say that she came there to be taken care of? A. Well, it seems as though she had been horse-back riding or something—I can't remember all the details—but her father and her sister brought her in there and asked me if I wouldn't help to take care of her. Q. That is the way that she passed the baby? A. Yes. Q. And you agreed to do that? A. Yes, sir. Q. Did you put her to bed when she got there? A. Yes. Q. How long was she in bed? A. Well, it was late the next day. Q. Did you give

her some medicine? A. Yes. Q. Did you give her any sodium amitol? A. Yes. Q. Or not? A. It seems like they gave her some H. B. C., so she wouldn't flow so bad there. Q. Who gave that to her? A. I did. Q. What other kind of medicine did you give her, if you know? A. Thats' all; that's all. Q. Did you put her on the operating table and examine her? A. No, sir. Q. What was her condition at the time she came in? A. Well, she was miscarrying when she came in. Q. Well, did you examine her to see that she was? A. No, I didn't have to; she passed it, herself, if she had stayed at home, she wouldn't have to have been there. Q. But did she come there for the purpose of passing this child? A. Yes. Q. And the child was born dead? A. Yes. Q. Still birth? A. Yes, sir. Q. What was done with the still-born child? A. Well, it stayed there and her Dad was supposed to come and get it and take it and bury it; her father. Q. All right. A. And he didn't do it. Q. Then, what was done? A. Then, he come up there and he took it away from there. Q. Who did? A. Brooks. Q. Who is Brooks? A. Well, he is the fellow that was taking care of the fences and things out there in the country for me. Q. Have you a place in the country? A. Yes. Q. Did you instruct him what he was to do with it? A. No. Q. Where is this place located? A. 2748 Northwest 57th Street. Mr. Miskovsky: Oh, I guess that's enough. A. (continuing) My son was out there and he got sick—my younger son—and he couldn't stand the work and he had to give it up and let it go. Q. Mrs. Griffin, you understand that the matters and things that you have told Mr. Fullenwider (the notary public) here in the presence of Frank Lynch and Art Minnick and Bob Turner and myself can be used as evidence against you in the event of a prosecution? A. Yes, sir. Q. For an attempted abortion or for murder, do you not? A. Yes, I understand that. Q. And in connection with the matters and things that you have told the reporter, in the presence of the persons that I have named here, it has all been voluntary on your part, has it not? A. Yes, sir Q. No threats or promises of any kind have been made to you? Have they? A. No, sir. Q.

Or abused you in any way, have they? A. No, sir. Q. Nobody has mistreated you? A. No. Witness excused."

In support of this contention, defendant cites in her brief only the case of Taylor v. State, 27 Okla. Cr. 165, 225 P. 988. In that case the statement made was held admissible, and the case supports the contention of the state. The question of voluntary and involuntary statements has been before this court many times. We therefore do not consider it necessary to quote from these cases, but merely cite some of them. The more recent cases are Lyons v. State, 77 Okla. Cr. 197, 138 P. 2d 142, 140 P. 2d 248; Id., 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481; Fry v. State, 78 Okla. Cr. 299, 147 P. 2d 803; Smith v. State, 77 Okla. Cr. 142, 140 P. 2d 237; Wood v. State, 72 Okla. Cr. 364, 116 P. 2d 728; Williams v. State, 65 Okla. Cr. 336, 86 P. 2d 1015. See also Wilson v. State, 17 Okla. Cr. 47, 182 P. 613; Berry v. State, 4 Okla. Cr. 202, 111 P. 676, 31 L. R. A., N. S., 849; Lucas v. State, 26 Okla. Cr. 23, 221 P. 798; Edwards v. State, 46 Okla. Cr. 77, 288 P. 359; Anderson v. State, 8 Okla. Cr. 90, 126 P. 840, Ann. Cas. 1914C, 314; Mays v. State, 19 Okla. Cr. 102, 197 P. 1064; Cooper v. State, 31 Okla. Cr. 165, 237 P. 865. These cases state fully the rule adopted by this court as to voluntary and involuntary statements, and the procedure to be followed by the court with reference to the admission or refusal to admit them in evidence.

We have carefully examined the statement made by the defendant as above quoted, and are of the opinion that under the law as held in the above-cited cases, it was a voluntary statement, and the court did not err in permitting it to be introduced in evidence. There was no promise of benefit or threat of harm made to the defendant by the may have been some hesitancy on her part at first, but it county attorney or any officer having her in custody. There

is a clear-cut, voluntary statement, in which she gives a complete account of the practice in which she was engaged. For a number of years she had conducted an "abortion mill" in Oklahoma City, and hundreds of women had entered her place of business for the purpose of securing abortions. She flagrantly advertised her business, and relates the fees charged for her services. She brazenly admits that she knew that it was a plain violation of the law, but attempts to justify herself by saying that she was administering to those in need. She did not even have a license to practice medicine in the state and was not a doctor. In almost all of the cases we have examined, the party charged has had a license to practice medicine, and was at least qualified from a medical standpoint to administer to those upon whom the abortion was performed. The best illustration of this nefarious practice is the death of the deceased in the instant case because of the practice and conduct of the defendant. In one part of her statement she attempted to deny that she had attempted an abortion on the deceased, but throughout the statement it is clearly revealed that she had so attempted, and that as a result thereof Naomi Congdon forfeited her life.

D. Congdon, the husband of defendant, testified that deceased was in good physical condition on Saturday and Sunday prior to her entering the home or place of business of defendant on Monday. On Sunday he and his wife had spent the day at Turner Falls. This trip was made by automobile. He also testified that when he went to see his wife on Tuesday evening that defendant first told him that he had nothing to worry about, and that she said something about having twisted the iron in some way that created the abortion. He testified:

"Q. Did she state to you in what part of the vagina she twisted the iron?  A. She stated what it was, but not be-

ing a doctor, the terms like that didn't mean anything to me, but the way I understood it, it was part of the outside or part of the womb which was twisted in some way or other."

He further testified that when he returned on the following day (Wednesday) he found his wife very sick and running a high temperature. It was at this time he procured a doctor from the Shore Patrol and she was taken to the South Naval Base Hospital at Norman.

We find that the court did not err in permitting the statement made by defendant to be introduced in evidence, as it was a voluntary statement under the decisions of this court above cited. But we again call the attention of county attorneys and officers to the recent decisions of the Supreme Court of the United States in dealing with federal offenses and the late cases from this court with reference to giving defendants an opportunity to have and consult counsel after their arrest.

Alleged errors numbered 3 and 4 are without merit. The record abundantly shows that the deceased was pregnant at the time she was administered to by defendant. The testimony of a number of doctors who examined her, and the testimony of her husband all reveal this fact. The contention that the evidence did not show the cause of her death is untenable. The testimony of Dr. Cooper, who was stationed at the South Navy Base Hospital at Norman, where deceased was taken from defendant's place of business and died ten days thereafter, was that she died of "septicemia" caused by an abortion, and this was his report to the State Health Department, and the death certificate was offered in evidence. He testified:

"Q. What was your conclusion as to that, Doctor, did you determine what the cause of the 'septicemia' was?   A.

From our examination, the only patent portal of infection for the bacteria was from the urine and we could find no other portal of entry into the blood stream of a streptococcus or any other germ as far as that is concerned."

This testimony was corroborated by Dr. Erick W. Thurston, a Lieutenant Commander, stationed at the South Naval Base, Norman, Oklahoma, who performed an autopsy upon the body of deceased. He testified:

"Q. Were you able to determine from your autopsy the portal entry of the bug into the blood system or blood stream? A. My conception was the lining of the uterus. Q. Were you able to determine or to find any other portal of entry? A. I did not."

Evidence was offered by defendant to show that deceased had suffered injury to one of her feet, and testimony by physicians that such an injury could have produced "septicemia," or blood poisoning. This was a question of fact for the jury, and the verdict being against the defendant, will not be reversed on appeal. There was abundant evidence to sustain the verdict.

The fifth assignment of error was with reference to the court's refusal to permit defendant to prove antecedent declarations made by deceased.

This has reference to the testimony of Mrs. James W. Scott. She was permitted to testify with reference to a visit to the apartment of deceased, Naomi Congdon, prior to the time she was at defendant's place, for the purpose of collecting rent from her for the apartment. She was permitted to testify to the physical condition of Mrs. Congdon and of her limping, and having one foot bandaged. The court refused to permit conversations between the witness and deceased in the absence of the defendant, on the ground that it was hearsay and was no part of the res gestae. Defendant cites and relies upon the case of Starks v. State,

67 Okla. Cr. 156. 93 P. 2d 50, 54. This case does not sustain the contention of the defendant. It is there said:

"It is contended that the court committed error prejudicial to the defendant in admitting the testimony of the widow of the deceased, wherein she states that the niece of the deceased had a miscarriage and told her that the defendant was the father of that child, and that she communicated that to her husband.

"It is a general rule that the charge upon which a defendant is being tried cannot be supported by proof of his having committed other offenses; but evidence which legitimately tends to support the charge is not to be excluded on the ground that it will show other offenses.

"Evidence of a crime different from the one charged is never admissible, except for the purpose of showing motive, intent, guilty knowledge or where to make out the crime charged the intent with which the act is done is material.

"The evidence fails to show that the defendant was present when this statement was made, and for this reason we think that this testimony was incompetent."

It will be noted in the above case that the court had permitted the evidence to be introduced and the court held this was incompetent. Here the court refused to permit the introduction of the evidence.

The general rule with reference to the admissibility of such evidence is stated in 22 C. J. S., Criminal Law, § 740, p. 1276, as follows:

"As a general rule, statements and declarations by the person injured by the crime are not admissible, unless a part of the res gestae or, within the exception as to dying declarations, unless introduced for impeachment purposes or to show an admission by accused when they were made in his presence.

"The person injured by the crime, whether alive or dead, is in no sense a party to the prosecution, and therefore his statements and declarations are not evidence either for or against accused, unless they are relevant on the question of accused's guilt and were made in his presence, or unless they are admissible as part of the res gestae, * * *. Such testimony is generally inadmissible as hearsay; but, provided a proper foundation has been laid, it is sometimes received for the sole purpose of impeaching or contradicting the testimony of the person injured, or of contradicting the testimony of a witness for accused. Admissions by the alleged injured person which are against his pecuniary interests and which have a direct bearing on the guilt or innocence of accused have been admitted on his behalf, even though they were not made in his presence, at least where declarant is absent from the state."

See also Morrison v. State, 59 Okla. Cr. 245, 57 P. 2d 822.

The sixth assignment of error is that the court erred in submitting to the jury the issue of manslaughter in the first degree as an included offense.

It is provided in Tit. 21 O. S. 1941 § 701 that homicide is murder:

"3. When perpetrated without any design to effect death by a person engaged in the commission of any felony."

Tit. 21 O. S. 1941 § 711 provides that homicide is manslaughter in the first degree:

"1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor."

The information here charged the defendant with the crime of murder. It also charged that the defendant was not "a licensed medical doctor" and that she did not have

legal authority to practice medicine. Tit. 59 O. S. 1941 §
491 provides that one who practices medicine or surgery
without a license or certificate from the Board of Medical
Examiners of this State shall be guilty of a misdemeanor.
The evidence in this case disclosed that defendant did not
have any such license or certificate, and the court in in-
struction No. 12 submitted this issue to the jury and de-
fendant was found guilty of manslaughter in the first de-
gree. It is evident that is was upon this instruction that the
jury justified its verdict of guilt of manslaughter in the
first degree.

This court has often decided that where one is charged
with murder, manslaughter is an included offense. Kent
v. State, 8 Okla. Cr. 188, 126 P. 1040; James v. State, 14
Okla. Cr. 204, 169 P. 1127; Clark v. State, 63 Okla. Cr. 138,
73 P. 2d 481; Tucker v. State, 66 Okla. Cr. 335, 92 P. 2d
595; Orrell v. State, 79 Okla. Cr. 300, 154 P. 2d 779; Prit-
chett v. State, 79 Okla. Cr. 401, 155 P. 2d 551; Roberts v.
State, 82 Okla. Cr. 75, 166 P. 2d 111.

We have also often held that where one is charged with
murder and is convicted of manslaughter he will not be
heard to object when it appears under the evidence he
ought to have been convicted of the crime of murder. War-
ren v. State, 6 Okla. Cr. 1, 115 P. 812, 34 L. R. A., N. S.,
1121; Jones v. State, 8 Okla. Cr. 576, 129 P. 446; Irby v.
State, 18 Okla. Cr. 671, 197 P. 526; Welborn v. State, 70
Okla. Cr. 97, 105 P. 2d 187.

We therefore find that the court did not err in submit-
ting the issue of manslaughter in the first degree, but that
it was his duty to do so under the evidence submitted in
this case.

For the reasons above stated, the judgment of the district court of Oklahoma county is affirmed.